No. 24-2874

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

MURAT KURASHEV,

Defendant-Appellant.

———————————

On Appeal from the United States District Court
for the Eastern District of California
(Hon. Kimberly J. Mueller, No. 2:21-CR-40-KJM)

———————————

**SUPPLEMENTAL EXCERPTS OF RECORD**
**Volume 1 of 1**

———————————

KIMBERLY A. SANCHEZ
*Acting United States Attorney*
*Eastern District of California*

HEIKO P. COPPOLA
*Assistant U.S. Attorney*

JOHN A. EISENBERG
*Assistant Attorney General*
*for National Security*

JOSEPH P. MINTA
GAVAN W. DUFFY GIDEON
*Attorneys, Appellate Section*
*National Security Division*
*U.S. Department of Justice*
*950 Pennsylvania Ave. NW*
*Washington, DC 20530*
*(202) 320-0621*

# INDEX

**<u>SER Page</u>**

Order re Detention (filed 12/01/2023)
Docket No. 137 ................................................................................................................ 3

Transcript of 10/02/2023 Evidentiary Hearing,
Docket No. 136 .............................................................................................................. 13

Transcript of 06/26/2023 Detention Hearing,
Docket No. 113 .............................................................................................................. 92

1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    United States of America,                          No. 2:21-cr-00040-KJM-1

12                          Plaintiff,                    ORDER

13           v.

14    Murat Kurashev,

15                          Defendant.

16

17           On August 25, 2023, this court granted defendant Murat Kurashev's motion for

18    reconsideration of this court's order revoking in part the magistrate judge's release order.  *See*

19    Prior Order (Aug. 25, 2023), ECF No. 127.  The court determined Mr. Kurashev had identified

20    new information justifying "this court's review of bail to consider anew whether there are

21    'conditions of release that will reasonably assure the appearance of the person as required and the

22    safety of any other person and the community.'"  *Id.* at 3[1] (quoting 18 U.S.C. § 3142(g)).  The

23    court then held an evidentiary hearing on October 2, 2023.  Mins. Evid. Hr'g, ECF No. 130.

24    Heiko Coppola and Dmitriy Slavin appeared for the United States.  *Id.*  Christina Sinha and

25    Megan Hopkins appeared for Mr. Kurashev.  *Id.*  The United States' witness, Jessi Groff, and

26    Mr. Kurashev's witness, Liana Kurasheva, the latter using the services of the Russian language

---

[1] When citing page numbers on filings, the court uses the pagination automatically generated by the CM/ECF system.

1                                                                                                    **SER-3**

1    interpreter, were sworn and testified. *Id.* The parties presented their closing arguments in written

2    format. *See* Gov't's Closing Statement, ECF No. 133; Def.'s Closing Statement, ECF No. 134.

3    Having considered the parties' arguments, the court **affirms** its prior order.

## I.     LEGAL STANDARD

5          The Bail Reform Act "mandates the release of a person pending trial unless the court

6    'finds that no condition or combination of conditions will reasonably assure the appearance of the

7    person as required and the safety of any other person and the community.'" *United States v. Hir*,

8    517 F.3d 1081, 1085–86 (9th Cir. 2008) (quoting 18 U.S.C. § 3142(e)). However, there is a

9    rebuttable presumption that "no condition or combination of conditions will reasonably assure the

10   appearance of the person as required and the safety of the community" if the court finds "there is

11   probable cause to believe that the person committed" a federal terrorism offense under 18 U.S.C.

12   § 2332b(g)(5)(B).  18 U.S.C. § 3142(e)(3)(C); *see Hir*, 517 F.3d at 1086. While the burden of

13   production shifts to the defendant, the burden of persuasion remains with the government. *Hir*,

14   517 F.3d at 1086.

15         "If a defendant proffers evidence to rebut the presumption" of flight risk or

16   dangerousness, the court considers the following factors to determine whether a defendant should

17   be released pending trial:

18                   (1) the nature and circumstances of the offense charged, including
19                   whether the offense is a federal crime of terrorism; (2) the weight of
20                   the evidence against the person; (3) the history and characteristics of
21                   the person, including the person's character, physical and mental
22                   condition, family and community ties, employment, financial
23                   resources, past criminal conduct, and history relating to drug or
24                   alcohol abuse; and (4) the nature and seriousness of the danger to any
25                   person or the community that would be posed by the defendant's
26                   release.

27   *Id.* at 1086 (citing 18 U.S.C. § 3142(g)).  A court's finding that a defendant is a danger to any

28   other person and the community must be supported by "clear and convincing evidence."

29   18 U.S.C. § 3142(f)(2).  The government bears the burden of showing a defendant is a flight

30   risk by a preponderance of the evidence. *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th

31   Cir. 1985).  If, after a hearing, the court finds "no condition or combination of conditions will

1  reasonably assure the appearance of the person as required and the safety of any other person and

2  the community," the court must order the detention of the person before trial.  18 U.S.C.

3  § 3142(e).

4         Here, where the court grants consideration in light of new information the defense

5  presents, it may reconsider previously decided questions, including whether the government has

6  met its burden to show no condition or combination of conditions will reasonably assure the

7  appearance defendant as required and the safety of the community.  *Cf. United States v. Burk*, No.

8  19-00117, 2021 WL 6617702, at *2 (D. Alaska Oct. 29, 2021) ("A judicial officer in a detention

9  hearing considers 18 U.S.C. § 3142(g) factors and considers any information presented."); *see*

10  *also* 18 U.S.C. § 3142(f)(2) (hearing may be reopened); *Leslie Salt Co. v. United States*, 55 F.3d

11  1388, 1393 (9th Cir. 1995) ("[T]he court may reconsider previously decided questions in cases in

12  which . . . new evidence has surfaced . . . .").

13  **II.    ANALYSIS**

14         The court has carefully reviewed all the relevant material in the record, including the

15  parties' briefs, videos provided to the court with translation, the pretrial service reports, oral

16  arguments and witness testimony.  Considering the evidence before it, the court finds there are no

17  conditions or combination of conditions that will reasonably assure the safety of any other person

18  and the community.

19         As a preliminary matter, defendant has proffered some evidence to rebut the presumption

20  that "no condition or combination of conditions will reasonably assure the appearance of the

21  person as required and the safety of the community."  *See* 18 U.S.C. § 3142(e)(3)(C).

22  Specifically, he has provided evidence of his lack of criminal history, witness testimony from his

23  wife, Liana Kurasheva, and the availability of bond and third-party custodians.  *See generally*

24  Mot. Recons., ECF No. 121; Def.'s Renewed Mot., ECF No. 85.  However, his proffer does not

25  mean the presumption is "erased."  *Hir*, 517 F.3d at 1086.  "[T]he presumption remains in the

26  case as an evidentiary finding militating against release, to be weighed along with other evidence

27  relevant to factors listed in § 3142(g)."  *Id.* (internal marks and citation omitted).  As noted, the

1    burden of production is on the defendant; the burden of persuasion remains with the government.

2    *Id.*

3          Here, the court declines to revisit its conclusion that the government has not shown by a

4    preponderance of the evidence there are no conditions of release that would reasonably assure the

5    appearance of Mr. Kurashev.  *See* Mot. Revoke Hr'g (June 26, 2023) Tr. 6:9–8:1,[2] ECF No. 113.

6    Defendant's lack of travel documents and ties with his immediate family in this country weigh

7    against a finding of flight risk.  Nothing suggests Mr. Kurashev would be able to evade pretrial

8    services supervision or the government's close monitoring him if released.  The court finds

9    certain conditions of release including monitoring and posting of bonds could reasonably assure

10   the appearance of Mr. Kurashev.  Thus, the court turns to determining the question of

11   dangerousness and considers the four statutory factors set forth in 18 U.S.C. § 3142(g).

12         First, the nature and circumstances of the offense charged is extremely serious.  Section

13   3142(g)(1) specifically requires the court to consider whether the offense charged is "a Federal

14   crime of terrorism."  Here, the indictment alleges Mr. Kurashev knowingly attempted to provide

15   "material support or resources" to a foreign terrorist organization in violation of 18 U.S.C.

16   § 2339B(a)(1)—knowing the organization Hayat Tahrir al-Sham, HTS, was a terrorist

17   organization and engages in terrorist activity.  *See* Indictment, ECF No. 1.  If convicted, he faces

18   up to 20 years in federal prison.  While recognizing Mr. Kurashev is innocent until proven guilty,

19   the nature and circumstances of the offense in this context weigh in favor of finding

20   dangerousness.

21         Second, although the weight of the evidence is the least important factor, the decision in

22   *Hir* models the way in which the court considers the evidence here.  *See Hir*, 517 F.3d at 1090.

23   The court has considered the testimony of Jessi Groff who testified Faruk Fayzimatov is "a very

24   well-known recruiter, fundraiser and propagandist" for HTS.  Evid. Hr'g Tr. 8:22–23, ECF No.

25   136.  HTS is and has been a designated terrorist organization at all the relevant times.  *See* Evid.

26   Hr'g. Tr. 7:2–23; Opp'n at 7 n.3.  However, Mr. Fayzimatov was designated as a "Specially

---

[2] For hearing transcripts, the court cites to the page numbers on the transcripts and not the page numbers generated by the CM/ECF system.

SER-6

1   Designated Global Terrorist" in July 2021, only after Mr. Kurashev was indicted.  *See* Evid. Hr'g

2   Tr. 53:22–54:8; *see* Indictment.  Mr. Kurashev used encrypted means of communication and

3   utilized private networks, including virtual private networks or VPNs, to communicate with

4   Mr. Fayzimatov and access Mr. Fayzimatov's videos on a website called Muhajir.com.  *See id.*

5   10:22–24, 22:3–23:15.  He also accessed Muhajir.com on his son's device.  *Id.* 30:16–19.  After

6   transmitting his communications, Mr. Kurashev selectively deleted audio and video files as well

7   as messages that were sent to Mr. Fayzimatov, as well as to an NYPD Cyber operative, and other

8   individuals.  *See id.* 27:3–28:11.  In contrast, he did not delete any conversations with friends or

9   family.  *Id.* 28:8–11.  He also sent funds eighteen separate times in sums of a thousand dollars or

10  less to support Mr. Fayzimatov; Mr. Fayzimatov encouraged this pattern of sending smaller sums

11  of money as a means of avoiding "raising suspicion."  *Id.* 37:21–39:17.  Although each of Mr.

12  Kurashev's individual activities on their own may appear to be innocuous, taken together, the

13  overall circumstances suggest he made efforts to cover his tracks.

14          In addition to these actions, Ms. Groff testified the following circumstances demonstrate

15  defendant's radicalization.  The contents Mr. Kurashev accessed on Muhajir.com depicted images

16  Ms. Groff characterized as "radical extremist images."  *Id.* 40:5–19.  For example, one exhibit

17  showed an image of a decapitated head of a French teacher killed by an individual in France, who

18  was in direct contact with Mr. Fayzimatov.  *Id.* 40:8–17.  According to Ms. Groff, someone

19  would have to search for these images; these are not images "you would just happen upon."  *Id.*

20  4:17–19.  Apart from Muhajir.com, Mr. Kurashev also looked at military tactical equipment and

21  searched for terrorist attacks all over the world.  *Id.* 39:8–17.  Mr. Kurashev also became involved

22  in a project called Umma Life after Mr. Fayzimatov told him he was fundraising for it.  *Id.* 25:25–

23  26:23.  Umma Life is "part of the umbrella of the HTS projects" and according to

24  Mr. Fayzimatov, it helps to "control people's minds."  *Id.* 26:14–19; *see also id.* 35:22–36:4.

25  Ms. Groff testified Umma Life is "an entryway to get people radicalized and then funnel them

26  into Muhajir.com, which is the overt HTS website."  *Id.* 26:20–23.  Mr. Kurashev expressed

27  support for Umma Life and stated he would provide funds for the project.  *Id.* 36:8–14.  He

28  acknowledged the risks to the "soul's safety and money," and affirmed he would not regret the

SER-7

1    money he spends on the project, even if it were to be shut down, because he would be rewarded.

2    *Id.* 36:8–37:1.  Ms. Groff suggested Mr. Kurashev was talking about heavenly, nonfinancial

3    rewards.  *Id.* 36:22–37:1.  According to Ms. Groff, this again demonstrated his radicalization

4    because he was "putting financing of a foreign terrorist organization above his own safety and

5    security[.]"  *Id.* 36:17–21.  Moreover, when defendant sent funds to an individual in Turkey who

6    according to Ms. Groff was "basically a courier" for Mr. Fayzimatov, *id.* 25:6–26:5, Mr.

7    Kurashev made sure to write the money was for relatives in Turkey to hide the real reason for the

8    transfer, *id.* 32:19–33:2.  The defense did not present any evidence to rebut the government's

9    expert or its evidence.  For example, while Ms. Kurasheva testified her husband told her about

10   Umma Life and explained it was a social media platform for Muslims, *id.* 70:1–71:11, the

11   testimony itself does not rebut Ms. Groff's testimony that Umma Life is a project of HTS.

12   Additionally, while Ms. Kurasheva testified she knew Mr. Kurashev was sending money abroad,

13   *id.* 66:19–67:1, 76:3–10, she did not know where or to whom he was sending money to, *id.* 76:5–

14   6.

15           The court also has considered the following evidence it previously gave weight to in its

16   order revoking the magistrate judge's release order: Mr. Kurashev's communications with Mr.

17   Fayzimatov, including statements indicating his desire to be a martyr—a shahid—and wishes to

18   join the fight in Syria; that "war is an expensive pleasure" in the context of discussing funding

19   needs in the amount of $200,000; the nature of the media content Mr. Kurashev accessed; as well

20   as the transfer of approximately $13,000, including $200 in bitcoin, followed by his efforts to

21   cover tracks to support Mr. Fayzimatov's activities, which cannot reasonably be characterized as

22   limited to media activism.  *See* Mot. Revoke Hr'g (June 26, 2023) Tr. 9:10–11:2.  While

23   defendant has provided a letter to the court, he has not produced additional evidence to

24   persuasively support his contention that he was merely supporting media activism and his

25   communications are not indicative of radicalization, *see* Letter, ECF No. 125-1 (informing court

26   he thought Mr. Fayzimatov was just a media activist and explaining his use of the phrase "war is

27   an expensive pleasure").  The defense has not produced its own expert testimony to rebut or call

28   into question Ms. Groff's testimony.  Nothing in the record allows the court to conclude the

**SER-8**

1    media content defendant accessed is analogous to "American rap and hiphop music that depicts

2    guns and violence and conflict." *See* Mot. Revoke Hr'g (June 22, 2023) Tr. 14:21–25, ECF No.

3    120.  No evidence suggests Muhajir.com is a site supporting independent journalism without ties

4    to any designated terrorist organizations.  The defense also does not support its argument that

5    Mr. Kurashev's statements mean something different in the Russian linguistic or semantic context

6    or in the mainstream Muslim community. *Id.* 10:11–12:11.  Having considered the totality of the

7    evidence, the court concludes significant evidence weighs against Mr. Kurashev and in the

8    government's favor with respect to dangerousness.

9            The third factor, history and characteristics of the person, weighs slightly against a finding

10   of dangerousness.  Although defendant's communications with Mr. Fayzimatov and transfer of

11   significant funds to him while his immigration case was pending calls Mr. Kurashev's judgment

12   into question, he has no criminal history in the United States, has a positive employment history,

13   and is a father of four young children who reside in this country.  His wife, Ms. Kurasheva,

14   testified to his calm, kind and good natured character.  Evid. Hr'g. Tr. 66:3–6.  The court has no

15   reason to doubt Ms. Kurasheva's credibility.  This factor weighs against a finding of

16   dangerousness.

17           Finally, the fourth factor, the nature and seriousness of the danger to any person or the

18   community that would be posed by Mr. Kurashev's release, also weigh against release.  Under

19   *Hir*, the court may consider the danger to a foreign community, including Syria, which the

20   government argues is the relevant community at issue. *See* 517 F.3d at 1088–89.  Here, the court

21   finds the government has provided clear and convincing evidence indicating Mr. Kurashev was

22   willing to financially support activities that pose a significant danger to people in Syria.

23   Accordingly, this factor weighs in favor of finding dangerousness.

24           Having considered the four factors, the underlying federal terrorism charge and the

25   presumption of dangerousness that remains "as an evidentiary finding militating against release,"

26   *Hir*, 517 F.3d at 1086, the court finds the government has met its burden, by clear and convincing

27   evidence, to show Mr. Kurashev poses a danger to any other person and the community.

1   "Even where a defendant poses a danger, he must still be released if there is a 'condition

2   or combination of conditions [that] will reasonably assure . . . the safety of any other person and

3   the community.'" *Id.* at 1091–92 (quoting 18 U.S.C. § 3142(e)).  The magistrate judge ordered

4   Mr. Kurashev released on specific conditions including restriction of internet access, location

5   monitoring, and home detention, and posting of a $45,000 cash bond and two unencumbered

6   vehicles.  *See* Renewed Mot. Bail Rev. Tr. 25:3–24, ECF No. 106.  The defense argues the

7   government has failed to provide evidence that "a complete restriction on Mr. Kurashev's access

8   to the internet . . . , coupled with a restriction on his travel outside of his home controlled by

9   location monitoring, and the appointment of one or more third party custodians, would not

10   reasonably assure the safety of the community at issue."  Def.'s Closing Statement at 5.

11   First, the bond amount already posted—$45,000 and two vehicles—is too low given the

12   weight of the evidence in this case and the apparent availability of greater bond resources.  *Cf.*

13   *United States v. Goba*, 220 F. Supp. 2d 182, 194 (W.D.N.Y. 2002) (requiring a bond in the sum

14   of $600,000 for individual charged with violating 18 U.S.C. § 2339B).  Although it appears

15   additional resources are available, they have not been formally offered or made available.  For

16   example, the Pretrial Services Report dated August 21, 2023, notes Andrey Kashivskiy at one

17   point expressed a willingness to cosign an unsecured bond on defendant's behalf in an amount up

18   to $200,000.  *See* Pretrial Service Fourth Supplemental Bail Review.  Additionally, Ms.

19   Kurasheva, Mr. Alikhan Evoloev and Mr. Don Watson have indicated their willingness to post

20   additional amounts.  *See* Mot. Revoke Hr'g (June 22, 2023) Tr. 32:23–34:15.  The court also

21   notes the check for $25,000 from Mr. Watson has been returned twice for insufficient funds.  *See*

22   Letter from Clerk, ECF No. 116.

23   Second, although Ms. Kurasheva, the proposed third-party custodian, has testified she

24   would report any violations of any conditions by Mr. Kurashev, and the court does not doubt her

25   sincerity, before his arrest, while living at home with her, defendant was able to communicate

26   with and send money to Mr. Fayzimatov without Ms. Kurasheva's knowledge.  *See* Evid. Hr'g

27   Tr. 66:19–67:1, 75:22–76:25.  The defense has not explained how Ms. Kurasheva could be more

28   effective post-arrest, given the nature of her marital and familial relationship with defendant.

1        Finally, no matter how stringent a set of conditions is, for any proposed conditions to be

2 effective, they depend on Mr. Kurashev's good faith compliance.  *See Hir*, 517 F.3d at 1093; *see,*

3 *e.g.*, *United States v. Brugnoli-Baskin*, No. 22-00499, 2022 WL 16636429, at *6 (W.D. Wash.

4 Nov. 2, 2022); *United States v. Christie*, No. 10-00384, 2010 WL 2900371, at *7 (D. Haw.

5 July 20, 2010); *United States v. Petersen*, 557 F. Supp. 2d 1124, 1131 (E.D. Cal. 2008).  As the

6 court has noted, the government's evidence shows Mr. Kurashev sent financial support to

7 Mr. Fayzimatov for reasons that cannot reasonably be characterized as solely motivated by a

8 support for media activism, a narrative defendant maintains.  *Compare* Evid. Hr'g. Tr. 20:21–

9 39:17 (describing media content and communications), *with* Letter (noting he thought

10 Mr. Fayzimatov was a media activist and naively donated money).  Mr. Kurashev did so eighteen

11 different times, Evid. Hr'g. Tr. 38:20–21, and did so while knowing he was subject to Immigration

12 and Customs Enforcement supervision and location monitoring while released within this country

13 pending immigration removal proceedings, *see* Pretrial Service Fourth Supplemental Bail Review;

14 Gov't's Closing Statement at 3.

15        Additionally, defendant's use of private networks and encrypted messaging applications,

16 *Id.* 22:1–30:19, and his successful deletion of specific communications, *id.* 28:2–7, are not

17 consistent with someone acting only in good faith.  Even with strict conditions, for example, he

18 may have access to his children's electronic devices.  *See id.* 30:16–19 (testifying defendant

19 accessed Muhajir.com using his son's phone).  While defendant suggests he would have been

20 deradicalized while detained even if he was allegedly radicalized beforehand, *id.* 57:1–61:13, he

21 has not effectively rebutted the government's evidence regarding radicalization and its

22 persistence, *see id.* 26:14–37:1, 60:6–61:13 (describing actions and circumstances demonstrating

23 radicalization).  Although Mr. Kurashev states he does not support HTS's message and will

24 "never ever have anything to do with" Mr. Fayzimatov again, *see* Letter, he has not expressly

25 disavowed HTS and its activities and there is no evidence he has voluntarily cooperated with law

26 enforcement agents or offered to disclose information regarding his activities and what he may

27 know.  *Cf. Goba*, 220 F. Supp. 2d at 194 (releasing on bail defendant who "apparently disavowed

28 or disclaimed any continued participation in the activities of [a designated terrorist organization],"

**SER-11**

1  voluntarily cooperated with FBI agents, "made disclosures about his own activities" and also

2  "made express statements of disagreement with the beliefs of [the designated terrorist

3  organization] and the use of terrorism against inhabitants of this country."). As in *Hir*, the court

4  finds there is "an unacceptably high risk" defendant will not comply with the proposed conditions

5  in good faith. *See* 517 F.3d at 1093.

6       Based on the current record and having considered the relevant § 3142(g) factors, the

7  court finds there are no conditions or combination of conditions that will reasonably assure the

8  safety of any person and the community such that Mr. Kurashev can be released. The court

9  **affirms** its prior order.

10      IT IS SO ORDERED.

11  DATED:  November 30, 2023.

12

13                                    _____
                                      CHIEF UNITED STATES DISTRICT JUDGE
14

1

1        UNITED STATES DISTRICT COURT

2        EASTERN DISTRICT OF CALIFORNIA

3                    --oOo--

4  UNITED STATES OF AMERICA,    ) Case No. 2:21-CR-00040-KJM
                                )
5              Government,      ) Sacramento, California
                                ) October 2, 2023, 10:15 a.m.
6         v.                    )
                                )
7  MURAT KURASHEV,              ) Re: Evidentiary Hearing
                                )
8              Defendant.       )

9

              TRANSCRIPT OF PROCEEDINGS
10   BEFORE THE HONORABLE KIMBERLY J. MUELLER
          CHIEF UNITED STATES DISTRICT JUDGE
11
   APPEARANCES:
12
   For the Government:      U.S. DEPARTMENT OF JUSTICE by
13                          MR. HEIKO P. COPPOLA,
                            ASSISTANT U.S. ATTORNEY
14                          MR. DMITRIY SLAVIN,
                            ASSISTANT U.S. ATTORNEY
15                          501 I Street, Suite 10-100
                            Sacramento, California  95814
16
   For the Defendant:      OFFICE OF FEDERAL PUBLIC DEFENDERS by
17                          MS. MEGAN TAYLOR HOPKINS
                            MS. CHRISTINA SINHA
18                          801 I Street, Third Floor
                            Sacramento, California  95814
19
   Also Present:           Eduardo Hairullin,
20                          Certified Russian Language Interpreter

21              MARYANN VALENOTI, RMR, CRR
                   Official Court Reporter
22              501 I Street, Suite 4-200
                   Sacramento, CA 95814
23              mvalenotiRMRCRR@gmail.com
                      (916)930-4275
24
   Proceedings reported via mechanical steno - transcript produced
25 via computer-aided transcription

2

1                          I N D E X

2     WITNESSES                                    PAGE

3     JESSI GROFF
            Direct Mr. Slavin ......................... 5
4           Cross Ms. Sinha .......................... 40

5     LIANA KURASHEVA
            Direct Ms. Hopkins ....................... 65
6           Cross Mr. Slavin ......................... 75
            Redirect Ms. Hopkins ..................... 77
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1      SACRAMENTO, CALIFORNIA, MONDAY, OCTOBER 2, 2023

2                          --o0o--

3      (In open court.)

4          THE CLERK:  Calling criminal case the 21-40, United

5  States versus Murat Kurashev.  This is on for an evidentiary

6  hearing.

7          THE COURT:  Appearances, please.

8          MR. COPPOLA:  Good morning, Your Honor.  Heiko Coppola

9  and Dmitriy Slavin on behalf of the United States.

10         THE COURT:  Good morning to each of you.  For Mr.

11 Kurashev.

12         MS. HOPKINS:  Good morning, Your Honor.  Megan Hopkins

13 and Christina Sinha for Mr. Kurashev who is not present

14 pursuant to a waiver.

15         THE COURT:  All right.  Good morning to each of you.

16         So the interpreter is not needed this morning?

17         MS. HOPKINS:  Your Honor, we are requesting the

18 interpreter for one of our witnesses, who is Russian speaking.

19         THE COURT:  Understood.  So the parties are prepared.

20 They understand the Court would plan to adjourn by around noon

21 today.  I don't know how long total the parties expect.  Have

22 you met and conferred, and do you have an estimate of time

23 needed?

24         MR. SLAVIN:  Yes, Your Honor.  We have only one

25 witness, and we estimate that it shouldn't take more than 30

4

1    minutes or so.

2              THE COURT:  And the defense?

3              MS. HOPKINS:  Your Honor, I don't have reason to

4    believe it would take longer than an hour to conclude today.

5    We have one witness as well and don't expect that to last

6    longer than about 15 minutes.

7              THE COURT:  All right.  And then would the parties

8    then make closing argument, or do you wish the chance to brief

9    the matter?

10             MS. HOPKINS:  Your Honor, I would be prepared to make

11   closing oral argument, or if the Court, after hearing the

12   evidence presented today, feels that briefing would be more

13   beneficial to the Court, we'd be happy to brief it.

14             THE COURT:  Does the Government have a preference?

15             MR. SLAVIN:  Likewise, Your Honor.

16             THE COURT:  All right.  Let's see where we are, then,

17   when we get there.

18             So the Government will go first; is that the parties'

19   plan?

20             MS. HOPKINS:  I think that would make the most sense,

21   Your Honor, just because that witness may take up the most

22   time.

23             THE COURT:  All right.  The Government may call its

24   witness then.

25             MR. SLAVIN:  The Government will call Special Agent

Groff - Direct by Slavin

1    Jessi Groff.

2          THE CLERK:  Please come to the witness stand, remain

3    standing, and raise your right hand.

4                JESSI GROFF, GOVERNMENT WITNESS, SWORN

5          THE CLERK:  Please say and spell your first and last

6    name for the record.

7          THE DEFENDANT:  Sure.  Jessi Groff, J-E-S-S-I

8    G-R-O-F-F.

9          THE COURT:  You may proceed.

10          MR. SLAVIN:  Thank you, Your Honor.

11                        DIRECT EXAMINATION

12    BY MR. SLAVIN:

13    Q    Special Agent Groff, how long have you been a special

14    agent, start with that?

15    A    I've been a special agent for 19 years.

16    Q    And what have you worked in in your time as a special

17    agent with the FBI?

18    A    I worked counterterrorism that entire time.

19    Q    And how long have you been working on the investigation

20    here?

21    A    Since its inception in October 2020.

22    Q    And you provided the Court with a number of affidavits in

23    this case.  You've also testified in this case before; is that

24    right?

25    A    I've provided -- I've assisted with affidavits.  I have

Groff - Direct by Slavin

1   not testified in this case before, no.

2   Q    Now, do you have special training related to

3   counterterrorism investigations?

4   A    Yes.  I have specialized training in international

5   terrorism investigations, operations and disruption strategies,

6   terrorism financing, Islamic -- the history of Islam and the

7   rise of Islamic extremism, identifying members of a foreign

8   terrorist organization and their associates who provide

9   logistics, supplies and material support, homegrown violent

10  extremists and foreign terrorist-organization-inspired attacks,

11  and analyzing digital data records and social media during an

12  international terrorism investigation.

13  Q    And through your training, your experience and also your

14  investigation in this case, have you become familiar with the

15  now long-running conflict in Syria?

16  A    Yes.  The Syrian conflict, the Syrian civil war that began

17  in 2011 and is ongoing, yes.

18  Q    And what has been the status of that conflict over the

19  last, say, 10 years or so?

20  A    There are -- there were several rebel groups that were

21  fighting the Bashar al-Assad regime in Syria, and they're

22  still -- it's still going on.

23  Q    And can you name some key groups that are relevant to this

24  case?

25  A    Yes.  The groups that were in Syria at the time of this

Groff - Direct by Slavin

1    case were ISIS and Hayat Tahrir al-Sham, which is HTS.

2    Q    Is HTS a designated terrorism organization?

3    A    Yes.

4    Q    And can you tell us just a little bit about the background

5    of HTS in Syria?

6    A    So, HTS in Syria, it originally started out as Tawhid

7    wa'al-Jihad in Iraq.  They were a -- one of their aliases is

8    al-Qaida in Iraq, that's the more commonly known name.  They

9    were designated by the United States State Department in 2004.

10        Then in 2012, a new group became relevant in Syria.  They

11   were the arm of al-Qaida in Syria, and their name was the

12   al-Nusra Front.  They then became an alias of Tawhid

13   wa'al-Jihad, and they were designated in 2014.

14        Then in 2016, due to a change in their relationship, the

15   relationship between al-Nusra Front and al-Qaida, the al-Nusra

16   Front was removed in the alias of Tawhid wa'al-Jihad, the

17   al-Nusra Front was then designated on its own because they were

18   still killing innocent Syrian civilians at the time.  So they

19   were designated by the United States State Department on their

20   own in 2016.

21        And then in 2018 the al-Nusra Front changed their name to

22   Hayat Tahrir al-Sham, so their new name is HTS, and their main

23   location is Idlib, Syria.

24   BY MR. SLAVIN:

25   Q    And who is the leader of HTS?

Groff - Direct by Slavin

1    A    Abu Muhammad al-Julani is the leader of HTS.

2    Q    You mentioned ISIS as another group involved in the

3    region.  They have a similar background to HTS; is that right?

4    A    Yes.  They are also an offshoot of al-Qaida in Iraq.

5    Q    So even though they've come from the same background,

6    they're now two separate organizations.  What is their

7    relationship to each other?

8    A    They are enemies in Syria.  They are fighting for the same

9    thing, money, power and land, but ISIS was defeated by the

10   Americans in March of 2019.  So, currently the main dominant

11   controlling organization in Syria is HTS.

12   Q    And even though they haven't gotten along with ISIS, have

13   they used similar methods in Syria?

14   A    Yes.  HTS has been seen to fly the al-Qaida flag in Idlib,

15   and then they also use suicide, vehicle-borne, improvised

16   explosive devices and suicide bombers.

17   Q    I want to focus on one individual named Faruk Fayzimatov.

18   Are you familiar with him?

19   A    Yes.

20   Q    Who is he?

21   A    He is, as discussed in the search warrant affidavit, he is

22   a very well known recruiter, fundraiser and propagandist for

23   the designated foreign terrorist organization HTS.

24   Q    And how did you first learn about him?

25   A    We first learned about him from the NYPD.  They contacted

Groff - Direct by Slavin

1    us in October of 2020 to let us know that they had identified

2    him in January 2019 as an HTS fundraiser.  So, then, during

3    their investigation of him they had deployed cyber operatives,

4    Russian-speaking cyber operatives to contact him and to

5    communicate with him online.

6    Q    And does he go by any other names?

7    A    Yes, one of his other names that he uses online is Faruk

8    Shami, which just means that he's Faruk in Sham, which is the

9    Arab term for the greater Syria region.  So Faruk in Syria,

10   basically.

11   Q    If it's okay with you, so we don't have to keep butchering

12   his last name, we'll call him "Faruk."

13   A    Sure.

14   Q    And so were you -- are you familiar with the NYPD

15   investigation of Faruk?

16   A    Yes.

17   Q    And have you reviewed some of the search warrants that

18   they've obtained in that investigation?

19   A    Yes.

20        MR. SLAVIN:  Your Honor, we have a number of exhibits

21   that we're going to use during this hearing to aid in the

22   agent's testimony, including the NYPD search warrant in the

23   investigation of Faruk Shami.  We're not looking to admit these

24   exhibits, but we've made them available to the Court and to the

25   defense.

Groff - Direct by Slavin

1    THE COURT:  All right, and the Court has a binder with

2  how many is it, 21 exhibits?

3    MR. SLAVIN:  Yes, Your Honor.  We don't intend to use

4  all of them today.

5    THE COURT:  All right.  The defense acknowledges

6  receipt of an equivalent binder?

7    MS. SINHA:  Yes, Your Honor, but we would object to

8  the use of an exhibit for this purpose unless the witness's

9  memory needs to be refreshed.

10    THE COURT:  All right.  You're on notice of that

11  position.

12    MR. SLAVIN:  Understood, and we'll go through it as

13  the issue comes up.

14    THE COURT:  All right.

15  BY MR. SLAVIN:

16  Q    Now, I want to talk about what you've learned through both

17  your and the NYPD's investigations of Faruk.  Did you learn

18  that he uses various online platforms?

19  A    Yes.  He uses lots of Telegram, What's App, Instagram,

20  Facebook, YouTube in order to recruit and fundraise for HTS.

21  Q    And does he have his own website?

22  A    Yes, he has his own website, Muhajir.com, which, again, is

23  a full of videos highlighting, you know, interviews of HTS

24  leaders and fighters.

25    He pushes out information regarding HTS's battle fronts,

Groff - Direct by Slavin

1   their battle strategies and tactics, their recent attacks, and

2   he promotes their successes on that website.

3   Q    Have you visited that website yourself?

4   A    Yes.

5   Q    Is it publicly accessible?

6   A    Yes.

7   Q    Do you speak Russian?

8   A    No.

9   Q    Is the website pretty much entirely in Russian?

10  A    Yes, yeah.  Faruk Fayzimatov is the Russian-speaking

11  fundraising arm of HTS, so all of the propaganda that he pushes

12  out is in Russian.

13  Q    So acknowledging your limitation of not being able to

14  understand the language using that website, have you seen on

15  that website any imagery that demonstrates affiliation with

16  HTS?

17  A    Yes.  There is images of fighters wearing HTS patches.

18  There's HTS flags, and then again, there's Abu Muhammad

19  al-Julani, who is a very well-recognized figure and is featured

20  on that website.

21  Q    Was that the case during a time relevant to this case,

22  between 2019 and 2021?

23  A    Yes.

24  Q    And did the FBI also obtain search warrants for the

25  defendant's home and his devices?

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Groff - Direct by Slavin

1   A    Yes.

2   Q    And we've talked about that warrant quite a bit in this

3   case.  Are you familiar with the affidavit in that warrant?

4   A    Yes.

5   Q    And have you reviewed in preparation for this hearing some

6   of the -- the summary of some of the posts, videos and other

7   material that Faruk put out that is discussed in that warrant?

8   A    Yes.

9   Q    And can you tell us about some of the -- briefly, some of

10  the highlights of the kind of information that was in that

11  warrant that Faruk has put out?

12  A    Yes.  Again, it shows that Faruk Fayzimatov is a

13  well-known recruiter, fundraiser, propagandist for HTS.

14       He's intimately involved and co-located with HTS in Idlib,

15  Syria.  He promotes their successes, like I said.  He promotes

16  their battle tactics, their suicide attacks.  He reports on

17  their training activities all with the intent of radicalizing

18  people and getting them to provide money or actually to travel

19  to Idlib, Syria and fight on behalf of HTS.

20  Q    So did the FBI create -- I'll take a step back.

21       Has the FBI had Russian-speaking linguists review some of

22  the material on Faruk's website?

23  A    Yes.

24  Q    Had they, through summary translations, prepared an

25  exhibit that includes clips and summaries of some of that

Groff - Direct by Slavin

1    video?

2    A    Yes.

3    Q    And have you reviewed that exhibit that we're going to

4    call Exhibit 3?

5    A    Yes.

6    Q    And can you summarize what these videos are?

7    A    So, again, these videos are of Faruk Fayzimatov on his

8    Muhajir website.  In one of the videos he's promoting the

9    suicide, vehicle-borne, improvised explosive device and

10   praising it, that it's going to go and be able to, you know,

11   kill the enemy.  He's talking about, quote, "media activists"

12   and he explains -- and he explains what that means.  In his

13   words he says, you know, that his accounts are constantly being

14   taken down.  So his platforms, his communication is being taken

15   down by YouTube and Telegram and Instagram constantly.  So he

16   asks his viewers for them to be, quote, "media activists" and

17   to repost his material, and he advises them to use VPNs and use

18   innocuous names for their fake accounts, to call their accounts

19   "Coffee," "Drinking Coffee" or "Drinking Tea," and then he

20   warns them, you know.  Don't use your real name, don't use your

21   real photographs in these accounts, and, you know, basically,

22   get the word out in order to recruit and fundraise for HTS.

23   Q    When he's making these videos, where is he physically

24   located based on what you've seen from the videos?

25   A    He constantly says that he's in Idlib, Syria.

14

Groff - Direct by Slavin

1    Q    And where is he relative to HTS?

2    A    He's co-located with HTS.  He is in the same area as HTS.

3    Q    And does he say anything about the frontlines of the

4    conflict?

5    A    Yes, yeah.  He's constantly talking about being in various

6    areas.  In one instance he talks about being in Saraqib, which

7    newspaper reports at that same time said that that was where

8    HTS was fighting and that he was there on the frontlines in

9    Saraqib.

10   Q    Now, did you review a video -- a post of a video and

11   article that Faruk posted -- that's posted in Russian but with

12   a translation titled, "At The Cost of His Life, He Sent

13   Mercenaries of Putin and Assad to Paradise"?

14   A    Yes, this is a website article that our certified Russian

15   linguist found, that's basically an article about Faruk

16   Fayzimatov praising and promoting this suicide bomber.

17        He says, you know, that he is the hero in this and that

18   he's sending him off, and there's a photo of Faruk Fayzimatov

19   with the suicide bomber right before he goes to conduct his

20   attack.  So, again, Faruk is promoting and praising this

21   suicide bombing.

22   Q    The person involved, was he part of the media or is he a

23   fighter for HTS?

24   A    He's a fighter for HTS, yes.

25   Q    And Faruk is praising his sacrifice?

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

**SER-26**

15

Groff - Direct by Slavin

1   A    Correct.

2   Q    Did the NYPD also provide to you returns from an Instagram

3   warrant related to Faruk's accounts and returns of other search

4   warrants that related to his online accounts?

5   A    Yes.

6   Q    And did they provide any reports to you regarding their

7   view of those search warrant returns?

8   A    Yes.

9   Q    And have you reviewed the compilations and descriptions in

10  those reports?

11  A    Yes.

12  Q    Now, is there -- does one of these reports relate to a

13  conversation that Faruk was having with a couple of members of

14  a different terrorism group ISIS?

15  A    Yes.

16          MS. SINHA:  Objection, relevance.

17          THE COURT:  Overruled.

18  BY MR. SLAVIN:

19  Q    Now, those conversations were private, correct?

20  A    Yes.

21  Q    So the defendant here would not have seen those

22  conversations?

23  A    No.

24  Q    Why were those conversations relevant to you in your

25  investigation, and why are they important to describing who

Groff - Direct by Slavin

1    Faruk is?

2    A    So, these are conversations that are between Fayzimatov

3    and two alleged ISIS fighters.  It appears they're reaching out

4    to Fayzimatov as a representative of HTS asking if they can

5    have safe passage to Idlib, Syria.  So they're ISIS fighters

6    that are fleeing from wherever they are located, and they're

7    asking Fayzimatov if they come to Idlib, will they be killed by

8    HTS?  So this is a very important question that they're asking,

9    and they're turning to the individual that they believe is the

10   most reliable source.

11   Q    So based on your review of these reports, does it appear

12   that these fighters are trusting Faruk Fayzimatov to speak on

13   behalf of HTS?

14   A    Yes.  Based on our review of the data, it appears that,

15   you know, Fayzimatov is co-located with HTS in Idlib, Syria, so

16   he would have an intimate knowledge of their battle strategies

17   and their tactics, and likely their strategy with regard to

18   ISIS members who are fleeing and requesting safe haven in

19   Idlib.

20   Q    Now, were there also reports involving Faruk Fayzimatov's

21   reaction to the death of ISIS's leader?

22   A    Yes.

23        MS. SINHA:  Objection, again, Your Honor.  Without any

24   evidence that these sentiments were known to Mr. Kurashev, it's

25   not relevant to today's proceeding.

Groff - Direct by Slavin

1    THE COURT:  Overruled.

2  BY MR. SLAVIN:

3  Q    Now, was Fayzimatov talking about some of this in his

4  public chats and posts?

5  A    I don't remember.  I know that it says that the NYPD were

6  provided a report of his Telegram chats, so I don't know if

7  that was a private Telegram chat or if that was a only Telegram

8  chat that anybody could see.  Without me reviewing the DD-5, I

9  don't know for sure.

10  Q    In the chats that he was having, does he -- what is his

11  stance on the death of the leader of ISIS?

12  A    So, in these Telegram chats he's lamenting the fact that

13  the Americans killed Abu Bakr al-Baghdadi, the leader of ISIS

14  rather than HTS.

15     In the chat he uses the terms, you know, "He was killed

16  next to us."  And he talks about "our security" in reference to

17  HTS because Baghdadi was actually killed in Idlib, Syria right

18  next to HTS.  So he's upset about the fact that HTS didn't find

19  him and kill him first.

20     He then also -- somebody within the chat asks him, Why

21  didn't HTS attack the Americans while they were in Idlib at the

22  Baghdadi raid, and Fayzimatov responds that HTS did indeed

23  attack the Americans, but they were overpowered by the

24  helicopters, the American's helicopters, the guns on their

25  helicopters.

page

Groff - Direct by Slavin

1    So this just demonstrates that Fayzimatov, again, is
2  intimately aware of HTS's actions within Idlib.  And then he
3  also provides insight that if Americans were in Idlib, that HTS
4  would attack them as well.
5  Q    Was there also, as part of these NYPD reports, reporting
6  and screen shots of Faruk Fayzimatov's Instagram and Telegram
7  accounts in which he's fundraising for HTS?
8  A    Yes.  They provided a report of their review of his
9  Instagram and of the video in mid May 2020.  That shows -- on
10  one of his Instagram he's basically announcing that, We have
11  opened a BITCOIN wallet.  So that's kind of the first sign that
12  we see of that.
13    And then on the last video, he says -- he's reporting --
14  it's a video of Fayzimatov, he says that he is located within
15  an office of an individual that he called Abu Dirar, and he
16  explains to his viewers that Abu Dirar is a member of HTS who
17  collects money for a military wing of HTS.
18    In the video Faruk Fayzimatov is holding a handful of
19  cash, and he actually hands the money to this individual that
20  he has identified as being an HTS member.
21  Q    And he also says that he's opened -- you said BITCOIN and
22  Monero wallets?
23  A    Yes, BITCOIN and Monero wallets, yes.
24  Q    And these are public-facing Instagram posts, right?
25  A    Yes.

Groff - Direct by Slavin

1    Q    On his account called "Chaepitie" or "Drinking Tea"?

2    A    Yes.

3    Q    And he also asks for people to contact him at a account

4    called Snaryadi?

5    A    Yes.

6    Q    And based on your investigation, do you know what that

7    term means?

8    A    Yes, Snaryadi means shells, as in, you know, it's

9    artillery shells from bullets, which is, you know, interesting

10    for a quote "media" figure.

11    Q    So he's asking people who want to -- who are interested in

12    the BITCOIN/Monero wallets, to contact him at an account with

13    that name?

14    A    Correct.

15    Q    You mentioned that you've also obtained a search warrant

16    for the defendant's digital devices.

17    A    Yes.

18    Q    And did you seize the -- did the FBI seize those devices

19    and obtain digital extractions?

20    A    Yes, we did.

21    Q    Did you create reports of those extractions?

22    A    Yes.

23    Q    Have you reviewed those reports?

24    A    Yes.

25    Q    A lot of the information from those reports was in a

Groff - Direct by Slavin

1   foreign language?

2   A    Yes, four different foreign languages.

3   Q    And did you obtain summary translations of a lot of that

4   information?

5   A    Yes.

6   Q    How were those made?

7   A    How were the translations made?  Through FBI certified

8   Russian and German and Arabic linguists.

9   Q    Now, of the devices seized, how many appear to be used by

10  the defendant?

11  A    Two of the devices, a Samsung Galaxy S8 plus.  It appears

12  he used that device from 2018 to November 2020, when he then

13  gave that -- it appears he gave that device to his 10-year old

14  son.

15       And then an Apple iPhone 12 Pro that he used beginning in

16  November 2020, that was his new phone, up until his arrest in

17  February 2021.

18  Q    Based on your review of those device extractions, were you

19  able to determine what websites the defendant visited?

20  A    Yes.

21  Q    Did you determine whether the defendant, or at least the

22  phones he was using, had visited Faruk Fayzimatov's Muhajir

23  website?

24  A    Yes, we could tell that, yeah, he visited Muhajir.com

25  quite often.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

**SER-32**

21

Groff - Direct by Slavin

1  Q    Do you recall off the top of your head when he first

2  visited that websites?

3  A    It appears from the Samsung device that he first visited

4  Muhajir on March 2, 2020.

5  Q    Did the extraction reports show anything about the

6  defendant's use of crypto currency?

7  A    Yes.  We could see that on or about May 22, 2020, he

8  downloaded a BITCOIN application onto his Samsung device.

9  Q    And why is that date significant to you?

10  A    It's significant because, again, like previously discussed

11  in mid May, Fayzimatov had promoted the fact that he -- that

12  "we" had opened a BITCOIN and Monero wallet on his Instagram

13  account, and just a few days later it appears the defendant

14  then also downloaded the BITCOIN application to his device.

15  Q    Did the extraction report also show that the defendant

16  used Telegram?

17  A    Yes, it appears that in or about June 7, so just a little

18  bit later, he started using the Telegram account with his user

19  name "Abu Salim" on his Samsung device.

20  Q    Did you see anything from the investigation of Faruk

21  Fayzimatov related to the use of Telegram?

22  A    Yes.  He's persistently and constantly telling his viewers

23  on Muhajir.com that they could contact him directly in order to

24  provide funds to HTS or to come and travel to Syria to contact

25  him via Telegram.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

**SER-33**

Groff - Direct by Slavin

1    Q    In all your experience in working counterterrorist cases,
2    is Telegram a common media to be used?
3    A    Within counterterrorism investigation, yes, because it is
4    an encrypted mobile messaging application, and it's one of the,
5    you know, higher levels of operational security that terrorists
6    use to communicate.
7    Q    Did the extraction report also show that the defendant
8    used any private networks or VPNs?
9    A    Yes.  So in -- at the end of June 2020, it appears that he
10   downloaded a VPN application to a Samsung device.
11   Q    And did he use that application?
12   A    Yes, we could see -- so it's significant because in the
13   Muhajir videos, many of the Muhajir start out, their beginning
14   screen is like a banner that says "Muhajir through VPN," so
15   they're essentially warning their viewers that you should be
16   accessing Muhajir anonymously due to the content on that
17   website.  So we do see that the defendant accessed Muhajir.  He
18   would access the VPN application first and then he would access
19   Muhajir.com in January and February 2021.
20   Q    Did the defendant also use a mobile messaging app called
21   Wickr Me?
22   A    He did.  In about July 22, 2020, I believe, he downloaded
23   the Wickr Me application on his device.
24   Q    And why is that relevant to you?
25   A    It's relevant because in July 7, 2020, Fayzimatov had

Groff - Direct by Slavin

1   posted a video stating that all his accounts were getting shut

2   down and that he was -- that he was no longer able to

3   communicate over Telegram, and so he was asking his viewers to

4   contact him on Wickr Me instead.

5   Q    Now, did you see an exchange between the defendant and

6   Faruk Fayzimatov relating to buying a bogus SIM card and

7   registering on Telegram?

8   A    Yes.  Yes, on Telegram Fayzimatov would tell him in a

9   direct message on Telegram, they spoke about, you know --

10  Fayzimatov told the defendant directly, "Go ahead.  Go and open

11  Telegram," and so the defendant did.  This was in

12  December 2020?

13       And then the defendant said, "Yes, I'll get a bogus SIM

14  card and I'll open up a Telegram," and then they could

15  communicate that way.

16  Q    This was on a one-on-one conversation?

17  A    Yes.

18  Q    Now, during or around the time of that conversation in mid

19  December 2020, did the defendant indicate that he was searching

20  for other like-minded people who could contribute financially?

21  A    Yes.  So in this conversation Fayzimatov announced to the

22  defendant that he was starting a new project, a new fundraising

23  project, and he needed more people to give money to this

24  project, and so he was asking for the defendant to find people.

25  So the defendant said he's trying to find like-minded people,

Groff - Direct by Slavin

1    but he told Fayzimatov, "You have to understand that it's not

2    easy."

3        And then Fayzimatov came back and said, "Well, you don't

4    actually have to basically tell them what the money is for, who

5    it's going to."

6        So this is significant in that it demonstrates that the

7    defendant and Fayzimatov know exactly where the money's going,

8    that it's going to HTS and that they're trying to get

9    additional individuals who may be unwitting to also provide

10   money to a foreign terrorist organization.

11   Q    Did Fayzimatov say to the defendant that the people he may

12   be seeking out to donate "don't necessarily have to support

13   us," and, "They don't necessarily need to know who we are"?

14   A    Yes.

15   Q    And what is your understanding of who "us" and "we" are in

16   that sentence?

17       MS. SINHA:  Objection, relevance.  Mr. Kurashev's

18   understanding is what would be relevant.

19       THE COURT:  In this instance, sustained.

20   BY MR. SLAVIN:

21   Q    Moving on.  Did you find any photographs on Mr. Kurashev's

22   devices?

23   A    Yes, many photographs.

24   Q    Can you tell us about any that are particularly

25   significant to your investigation?

25

Groff - Direct by Slavin

1   A    So one of the exhibits is of a fighter holding up -- he's

2   completely covered, and he's holding up a single index finger,

3   which is normal, typical terrorist propaganda denoting tawhid,

4   which is monotheism, and so yes, we do see that image of a

5   fighter on the defendant's device.

6   Q    During your investigation, did you find out about a person

7   named Shakhrizat Saaeva?

8   A    Yes.

9   Q    What is her role in this case?

10  A    She -- her name was provided to the defendant and to the

11  NYPD cyber operative as an individual that they could send

12  money to that would then get the money to Faruk Fayzimatov in

13  Syria.  She was located in Turkey and she was described as

14  basically a courier for Faruk Fayzimatov located in Turkey.

15  Q    And did the defendant send money to her?

16  A    Yes.

17  Q    And are those transactions discussed in the search warrant

18  affidavits?

19  A    Yes.

20  Q    Did the defendant also have conversations with her

21  husband, Albert Saaev?

22  A    Yes.

23  Q    Was there anything -- do you know how they first became

24  introduced, the defendant and Mr. Saaev?

25  A    Yes.  So in December 2020, Fayzimatov contacted the

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Groff - Direct by Slavin

1   defendant and said that, We have a brother.  He's our brother

2   located in Turkey, and he is legal and completely safe.  You

3   can trust him, that he would be contacting the defendant about

4   a new project and that he would be helping fundraise for that

5   project.

6       Later that very same day, Albert Saaev contacted the

7   defendant over Telegram.

8   Q    And what were those conversations about?

9   A    They were about sending money to Turkey to fund a project

10  and also sending money to -- sending money to Faruk.

11  Q    What was this project?

12  A    This project is called Umma Life.

13  Q    Whose project is this?

14  A    Fayzimatov describes it to the defendant on

15  February 18, 2021, the day before the defendant is arrested, he

16  explains that this is -- that the Umma Life project is part of

17  the umbrella of the HTS projects, that basically it's a -- he

18  calls it like a "clean white project," but then it's basically

19  to help to "control people's minds," those are his words.  So

20  basically it's an entryway to get people radicalized and then

21  funnel them into Muhajir.com, which is the overt HTS website.

22  So this is kind of his project, HTS's project to further

23  radicalize and recruit and to get people to fundraise for HTS.

24  Q    And that's the project that the defendant was talking

25  about with Mr. Saaev?

Groff - Direct by Slavin

1   A    Yes.

2   Q    Do you know what happened to those conversations?

3   A    Those Telegram conversations were deleted on the

4   defendant's device.

5   Q    Was the FBI able to recover them even though they were

6   deleted?

7   A    Yes.

8   Q    Now, based on your review of the phone, were there other

9   conversations on the defendant's device that were deleted?

10  A    Yes.  The defendant deleted his Telegram conversations

11  that were directly with Faruk Fayzimatov and the NYPD cyber

12  operative, and then another individual that we assess is

13  located in Germany, he had sent that individual located in

14  Germany a Faruk Fayzimatov video that he then deleted that

15  Telegram messaging.  It appears that he's deleting the Telegram

16  messages with individuals that he's talking to directly about

17  fundraising for HTS.

18  Q    Now, are there other conversations that the defendant was

19  having on Telegram that were not deleted?

20  A    Yes.

21  Q    What about other conversations on other platforms, was the

22  defendant, based on your review of the reports, in the habit of

23  deleting conversations?

24  A    No.

25  Q    Were there any others that were deleted?

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

28

Groff - Direct by Slavin

1  A    Yes.  He did delete a What's App string that he had with

2  his associate Alikhan Evloev.  He deleted several audio and

3  video files that they were passing back and forth to each other

4  that were successfully deleted.  We don't know what those were.

5  Then he deleted a text message string regarding polygamy and

6  Alikhan Evloev were talking about how they could obtain another

7  wife, so he did delete that text messaging.

8  Q    But other than those messages, were there any

9  conversations with friends or family or anything like that that

10 based on the reports were deleted?

11 A    No.

12 Q    And is Mr. Alikhan Evlov or Evloev, the husband of the

13 person who's being offered as a third-party custodian in this

14 case?

15 A    Yes.

16 Q    Do you know her name, his wife's name?

17 A    Dariya Kondrotova.

18 Q    Now, in your review, did you see a Telegram messages

19 between the defendant and Faruk Fayzimatov around January 11 of

20 2021?

21 A    Yes.

22 Q    And was there a specific video that you noticed from that

23 exchange?

24 A    Yes.  Faruk Fayzimatov had sent the defendant directly a

25 video from Muhajir, I believe, that was a video of, you know,

Groff - Direct by Slavin

1   10 or 11 dead bodies laying on the ground, and Fayzimatov is

2   praising these individuals and that they had died as shaheeds,

3   fighters protecting Syria.  So, again, this demonstrates that

4   Fayzimatov is promoting violence and terrorism and that the

5   defendant's fully aware that this isn't just about cameras.

6   Q    So were the people who Faruk Fayzimatov was praising in

7   this video, were they media or were they fighters?

8   A    They were fighters.

9   Q    Now, did you also review conversations between the

10  defendant and Fayzimatov a few days later on January 13 and 14,

11  2021?

12  A    Yes.

13  Q    What were those?

14  A    So on January 13, again Fayzimatov sends another video to

15  the defendant, and I can't remember exactly what that video was

16  off the top of my head.  Can I look at the exhibit?

17  Q    Would that help refresh your recollection?

18  A    It might help my recollection.

19  Q    If you could turn to Exhibit 10, please, and take a look

20  at it?

21  A    So the video is titled "Super Gift from Faruk Shami" and

22  the video is -- we have a summary translation from a certified

23  FBI Russian linguist.

24  Q    Before you go on, does reviewing that exhibit refresh your

25  recollection of what this conversation was about?

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Groff - Direct by Slavin

1   A    Yes, yes.

2   Q    What were the conversations between the defendant and

3   Fayzimatov related to these videos?

4   A    So on January 13, it was just a video was just sent to the

5   defendant.  I don't believe there was a conversation about it.

6   Q    What happened next?

7   A    So then we could see in the cached images, that the

8   defendant did indeed view this video on January 14 and 15, I

9   believe, from the cached images.

10  Q    What happened next?

11  A    And then from January 14, a review of the defendant's

12  apple iPhone revealed that some cached images of Faruk

13  Fayzimatov and some fighters on his device, and then directly

14  after those cached images, we see that the defendant accessed

15  passwords for VPNs, so he accessed NordVPN, Sky VPN and another

16  VPN called Dream Downloader VPN.  He accesses those passwords,

17  and then interestingly, he then goes to his son's phone; he

18  goes back to the Samsung device, and at the same, you know,

19  approximate time, and he goes straight to Muhajir.com.

20       In the web history, you could see that he accesses

21  Muhajir.com, and then he accesses by direct link several of the

22  videos on Muhajir.com still using his son's device.  So it

23  appears he's trying to hide his activity by using his son's

24  device rather than his own device at that point.

25  Q    Then a couple days later, January 16, 2021, Faruk

Groff - Direct by Slavin

1    Fayzimatov sends another video to the defendant?

2    A    Yes.  So on January 16, he sent a video directly to the

3    defendant basically talking about all the work they had done

4    and all their successes for the year and all the money they had

5    raised and then also promoting a new fundraiser for HTS.

6    Q    What did he say that he had done with the money that he

7    had collected in his video?

8    A    I don't remember.  I would have to look at the exhibit off

9    the top of my head.

10   Q    Did he mention that with the funds they've raised they had

11   been able to purchase over 10 motorcycles for the mujahids,

12   help over a hundred orphans and widows, and then equip over a

13   hundred mujahids?

14   A    Yes.

15   Q    And did the defendant do anything with this video?

16   A    Yes, and a couple days later on January 18, the defendant

17   then provided that video to the NYPD cyber operative and told

18   him to access Muhajir.com directly, and he also provided Faruk

19   Fayzimatov's new Telegram account.

20   Q    And around this time did the defendant also have a

21   conversation with the cyber operative regarding risk taking?

22   A    Yes.  The cyber operative expressed his concern for his

23   safety in receiving these videos, and so the defendant

24   responded something to the effect of, Yes, I understand, but

25   this is the risk we must take.  So we assessed that that means

Groff - Direct by Slavin

1  that the defendant is fully aware of what he's doing.

2          MS. SINHA:  Objection, Your Honor, as to foundation of

3  what he's aware of.

4          THE COURT:  Sustained.

5  BY MR. SLAVIN:

6  Q    Did the defendant do anything with this conversation with

7  the cyber operative?

8  A    I don't know.

9  Q    Do you recall if that's one of the conversations that was

10  deleted from Telegram?

11  A    It was, yes, yes.  All of the Telegram communications with

12  the NYPD cyber operative were deleted.

13  Q    Moving on a few days after this, so January 21, 2021, was

14  there an audio conversation via Telegram between the defendant

15  and Albert Saaev?

16  A    Yes.

17  Q    Was that conversation related to funds that the defendant

18  had attempted to send to Mr. Saaev?

19  A    Yes, yes, the defendant Albert Saaev was wondering why the

20  money hadn't arrived yet in Turkey, and so the defendant

21  responded that he didn't know, you know, he sent the money and

22  he made sure to write that the money was for relatives in

23  Turkey in order to obfuscate the real purpose of the funds so

24  that would ensure that the money would be delivered.

25  Q    Now, based on your investigation, have you seen any

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Groff - Direct by Slavin

1    evidence that the defendant has any relatives in Turkey?

2    A    No.

3    Q    Now, a few weeks after this in February 12, 2021, was

4    there a conversation between the defendant and Fayzimatov again

5    related to the sending of money to Fayzimatov?

6    A    Yes.

7    Q    Do you recall anything about this conversation?

8    A    I would have to refresh my memory.

9    Q    Would reviewing the conversation refresh your

10   recollection?

11   A    Yes, please.

12   Q    If I could ask you to turn to Exhibit 14, please, and just

13   review it, and let me know when you're done so we could discuss

14   it?

15   A    Are we talking about February 12?

16   Q    Yes, it should be Exhibit 14, just review it briefly and

17   tell me if it refreshes your recollection of that conversation?

18   A    Excuse me, exhibit.

19   Q    Fourteen?

20   A    Fourteen, okay.  I don't see a February 12.

21   Q    That's fine.  I'll see if I could refresh your

22   recollection just by talking through it with you.

23        You recall a conversation related to money that the

24   defendant sent directly to Fayzimatov?

25   A    Yes.  During the review of his apple iPhone, we found that

Groff - Direct by Slavin

1  the defendant sent $200 worth of BITCOIN directly to Faruk

2  Fayzimatov's wallet. Within this Telegram message Fayzimatov

3  provides his actual wallet ID, and the defendant then sends

4  $200 worth of BITCOIN to that wallet.

5  Q    Did Faruk Fayzimatov then contact the defendant to ask a

6  question about that transaction?

7  A    Yes. So Fayzimatov contacted the defendant asking what

8  the money was for, that basically he had to record it properly,

9  and he didn't know exactly where the defendant wanted the money

10 to go. So the defendant responded, you know, "I don't know

11 where you want it to go. You asked me for it, so I sent it to

12 you," basically leaving it for Fayzimatov's discretion as to

13 where the money could go. This showed us that Fayzimatov was

14 part of an organization where he has to actually record and

15 keep track and have a full accounting of where the fundraising

16 is going.

17 Q    Moving on to a different conversation. Was there a

18 Telegram conversation between Faruk Fayzimatov and the

19 defendant the day before the defendant was arrested?

20 A    Yes.

21 Q    And that would be February 18, 2021?

22 A    Yes.

23 Q    And what generally was happening in that conversation?

24 A    So two things were pretty interesting in that

25 conversation. The first thing that happened was that

Groff - Direct by Slavin

1   Fayzimatov contacted the defendant and told him that he was

2   about to go live, that he was about to do a live stream, and he

3   invited the defendant to join and come watch the live stream.

4   And the defendant responded, "Yes, I'm ready. I've been

5   waiting for it."

6        Then approximately two hours later, Fayzimatov again

7   reaches out to the defendant and asks if he watched it, and the

8   defendant said, Yes, you know, it was, you know, it was bomb.

9   I watched it.  It widened my worldview.  It was very good

10  information, and something to the effect of, you know, I'm like

11  a school kid, you know, learning my mathematics tables again.

12  So he was very appreciative of the information that he learned,

13  and we do not have -- we did not capture that video from

14  February 18, that live stream, so we don't know exactly what

15  was said, but based on multiple -- a plethora of videos and

16  live streams --

17            MS. SINHA:  Objection, speculation.

18            THE COURT:  Sustained.

19  BY MR. SLAVIN:

20  Q    Was this also the same conversation where Fayzimatov

21  discussed the Umma Life project?

22  A    Yes, yes, later on in the discussion Fayzimatov explains

23  that the Umma Life project is also part of, you know, this

24  bigger plan that appears to have been discussed in the live

25  stream that we don't know what was said, but he says basically,

Groff - Direct by Slavin

1   yes, Umma Life is also a big part of the plan.  We're very

2   excited about it.  We need sponsors for it.  The purpose is

3   basically to control people's minds, and as I discussed, yeah,

4   earlier.

5   Q    So we discussed that, I just want to also ask if Faruk

6   Fayzimatov mentioned risk to these projects as well in that

7   conversation?

8   A    Yes.  The defendant expresses his support for the project,

9   and says, you know, that he will provide money for it, and then

10  Fayzimatov reminds him that, you know, Any of our projects are

11  a risk to our soul's safety and money, and the defendant

12  responded, Yes, I understand, but even -- you know, even if

13  this project gets shut down, I won't regret the money that I've

14  spent on it.

15  Q    Did he say why he won't regret it?  Did he say that he

16  would be rewarded in other ways?

17  A    Yes, that he would be rewarded, so yeah.  This

18  demonstrates again his radicalization, and the fact that he is

19  putting financing of a foreign terrorist organization above his

20  own safety and security and then possible freedom because the

21  very next day he is arrested.

22  Q    So even though this conversation he says -- even though

23  the money may have been wasted and that the projects get shut

24  down, he'll receive nonfinancial rewards, meaning heavenly

25  rewards for participating?

Groff - Direct by Slavin

1   A    Yes.

2   Q    During your investigation did you also learn of other

3   individuals online who were involved with HTS?

4   A    Yes.  We saw a video, I believe in April 2020, with

5   Fayzimatov and an individual that he called Abu Qaqa, and in

6   that video Abu Qaqa is a fighter.  He's dressed in military

7   fatigues, and Fayzimatov is interviewing him and asking him how

8   he feels, you know, with Ramadan coming, and Abu Qaqa responds,

9   "We're on the frontlines, we're excited.  The men are excited

10  about becoming shaheeds for Ramadan," which means dying for the

11  sake of God near Ramadan.

12  Q    Did you find anything on the defendant's devices that

13  shows a knowledge of or interest in Abu Qaqa?

14  A    Yes, so we received Facebook search warrant returns on the

15  defendant's two Instagram accounts, and in those Instagram

16  accounts we see that the defendant is following Abu Qaqa_dag,

17  which is an Instagram account, and so when we went online and

18  researched that Abu Qaqa_dag account on Instagram, we found a

19  profile photo that matches the image of the individual that's

20  in the video with Faruk Fayzimatov.

21  Q    In your investigation, did you see any conversations where

22  the defendant discusses safer ways to transfer money overseas?

23  A    So he -- so what we see is that Fayzimatov explains to the

24  NYPD cyber operative that his brother -- we assess he's

25  referring to Murat Kurashev, the defendant -- he says that his

Groff - Direct by Slavin

1    brother has told him, told Fayzimatov that the safer way to

2    send money overseas without raising suspicion or getting caught

3    is by structuring the money in smaller amounts.  So he advises

4    that an individual can go to a money service business and send,

5    you know, small amounts of a thousand dollars or less at a time

6    to the same individual without raising suspicion or without

7    being asked additional questions by the money service business.

8         So Fayzimatov lays that out for the NYPD cyber operative

9    because the cyber operative is expressing a difficulty in

10   sending money because he is not going to send the money to HTS

11   for real, so Fayzimatov is trying to explain to him how the

12   defendant does it, and that he sends money often and that he's

13   successful in sending this money, and then on the same date

14   that Fayzimatov gave the NYPD cyber operative Murat Kurashev's

15   name, he then reiterates this brother is the one who's able to

16   send us money and that you can't send large amounts, but be

17   sure to send smaller amounts.

18   Q    And did the defendant's transactions in this case follow

19   that pattern?

20   A    Yes, they did.  He sent 18 transactions, all a thousand

21   dollars or less.

22   Q    Was there an instance where multiple of those transactions

23   even occurred on the same day?

24   A    Yes, there was one instance on September 17, 2020, where

25   the defendant had been in contact with Faruk Fayzimatov.  He

Groff - Direct by Slavin

1   had told him to send money to Shakhrizat Saaeva, and so the

2   defendant had gone directly to Walmart in Rancho Cordova and

3   then sent that money, and then just a couple days later he

4   appeared at a Walmart in North Highlands and sent an additional

5   $500 to another courier in Turkey.

6   Q    So these are at two different locations?

7   A    Yes, two different locations about 20 minutes apart.

8   Q    Now, did your review of the defendant's phone reveal any

9   searches for any military-type goods?

10  A    Yes.  We found and we placed in one of the exhibits a

11  compilation of searches, YouTube videos that he watched, and

12  cached images from his device that showed that the defendant

13  was looking at military tactical equipment, that he was

14  searching terrorist attacks basically all over the world, in

15  France and in the U.S. and that he -- yeah, that he was

16  searching up, yeah, terrorist attacks and military tactical

17  equipment.

18  Q    Now, you've mentioned cached images a couple times during

19  your testimony.  What does that mean?

20  A    So a cached image, I had to go -- I'm not a technical

21  expert, so I had to talk --

22          MS. SINHA:  Objection, foundation.

23          THE COURT:  Well --

24          MS. SINHA:  The witness just testified that she is not

25  familiar --

MARYANN VALENOTI - U.S. DISTRICT COURT -   (916)930-4275

Groff - Cross by Sinha

1    THE COURT:  I heard that, so I'm sustaining subject to

2    your laying a foundation that would make this testimony

3    meaningful.  Also, it's about 11:15, just so you know.

4    BY MR. SLAVIN:

5    Q   We'll move on.  I just have one final question:  Did your

6    review of the defendant's device show any violent imagery that

7    came from Muhajir?

8    A   Yes, we could see multiple, multiple images over, you

9    know, almost everyday of him consuming radical extremist images

10   from Muhajir, images of Faruk Fayzimatov, and on one of the

11   exhibits on Page 10 we could see an image of a decapitated head

12   of Samuel Patty, who was the French teacher who was killed on

13   October 16, 2020, by an individual in France who was in direct

14   contact with Faruk Fayzimatov at the time.  He sent an image --

15   he sent an image to Faruk Fayzimatov directly after the attack

16   before he was killed, that attacker, and that's in the news

17   that that occurred.  So we see that, and that's not an image

18   you would just happen upon.  You would have to search to find

19   something like that.

20           MR. SLAVIN:  No further questions.

21           THE COURT:  All right.  Ms. Sinha.

22           MS. SINHA:  Yes, Your Honor, thank you.

23                     CROSS-EXAMINATION

24   BY MS. SINHA:

25   Q   Good morning, Special Agent Groff.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

41

Groff - Cross by Sinha

1    A    Good morning.

2    Q    Before I get started, aside from the materials that you

3    mentioned on your direct and the information that is in the

4    binder before you, did you review any other materials in

5    preparation for your testimony today?

6    A    Yes, I reviewed online articles about HTS in Syria.

7    Q    Anything else?

8    A    Maybe a Counterterrorism Center article that included

9    information about Faruk Fayzimatov.

10   Q    Anything else?

11   A    That's it.

12   Q    Thank you.  Let's start off by talking about messaging

13   applications.  So the Government has said repeatedly in its

14   materials that many members and supporters of extremist

15   organizations routinely use mobile messaging applications with

16   end-to-end encryption.  So my question to you is this:  Those

17   sorts of applications are widely available; is that right?

18   A    Yes.

19   Q    And they are widely used by the general public?

20   A    I don't know.  Maybe yes.

21   Q    In your 19 years as a special agent, you're not familiar

22   with whether or not the general public uses end-to-end

23   encryption messaging applications?

24   A    I think a lot of the people that I do interview and talk

25   to do because of their family members that are overseas.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

**SER-53**

Groff - Cross by Sinha

1    Q    Thank you.  And those messaging applications, they include
2    household names like What's App?
3    A    Yes.
4    Q    And Telegram, which you testified about?
5    A    Yes.
6    Q    And What's App and Telegram are both messaging
7    applications with end-to-end encryption?
8    A    Yes.
9    Q    As is Signal?
10   A    Yes.
11   Q    Hackers, identity thieves, people of that nature, those
12   are concerns that the average person has to contend with; would
13   you agree with that?
14   A    Maybe, yes.
15   Q    One way to protect oneself against hackers is by using
16   messaging applications with end-to-end encryption; is that
17   right?
18   A    Okay.
19   Q    Do you agree or disagree with that?
20   A    I am not an expert on hacking.  So yes maybe, yeah.
21   Q    And as you mentioned, these applications are often used by
22   people who have loved ones abroad?
23   A    Yes.
24   Q    Let's switch gears a little bit and talk about VPNs.  Once
25   again the Government has said many members and supporters of

Groff - Cross by Sinha

1    extremist organizations routinely promote the use of VPNs,

2    which is why I'm even inquiring into this.  Just to make us

3    clear on this, is it your understanding that VPN stands for

4    virtual private network?

5    A    Yes.

6    Q    And if you're familiar with it, is it your understanding

7    that when a VPN is used, the data appears to originate from the

8    VPN server as opposed to from the individual who's using it?

9    A    Yes, it makes you anonymous when you are accessing a

10   website such as Muhajir.com.

11   Q    And anonymous, by your use of that term "anonymous," do

12   you mean that the user's IP address is kept private?

13   A    I believe so, yeah.

14   Q    And so knowing someone's IP address can reveal information

15   about them?

16   A    Yes.

17   Q    And using a VPN helps protect the user's Internet traffic

18   from surveillance?

19   A    Yes.

20   Q    Especially when, for example, they are on a public network

21   such as a library?

22   A    Yes.

23   Q    People who are not engaged in any kind of criminal

24   behavior also use VPNs to protect their privacy --

25   A    Yes.

Groff - Cross by Sinha

1    Q    -- and their identity.

2         Are you aware that mainstream magazines like Forbes

3    routinely put out articles helping users choose the best VPN

4    for themselves?

5    A    I have not seen that article, no.

6    Q    Ands VPNs are widely available?

7    A    I believe so.

8    Q    Let's switch gears a little bit again just in the interest

9    of time and moving along to BITCOIN.  So to make sure

10   everybody's using the same terminology, is it your

11   understanding that BITCOIN is a form of digital currency?

12   A    Yes.

13   Q    And the Federal Government has not -- the U.S. Federal

14   Government has not banned the use of BITCOIN; is that right?

15   A    No.

16   Q    Neither has the State of California?

17   A    No.

18   Q    So it's legal to use BITCOIN in California?

19   A    Yes.

20   Q    So Mr. Kurashev was in California when he was utilizing

21   BITCOIN?

22   A    Yes.

23   Q    And BITCOIN is widely available?

24   A    Yes.

25   Q    There are even BITCOIN ATM's right here in Sacramento; are

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Groff - Cross by Sinha

1   you aware of that?

2   A    No.

3   Q    In other words, BITCOIN is used by law-abiding people?

4   A    Yes.

5   Q    And Mr. Kurashev's BITCOIN was linked to his own bank

6   account; is that right?

7   A    Yes.

8   Q    That bank account had his name on it?

9   A    Yes.

10  Q    You saw no evidence of any financial fraud?

11  A    No.

12  Q    And every time, in fact, Mr. Kurashev sent any sort of

13  currency, that's the subject of this case, he did so using his

14  own name?

15  A    Yes.

16  Q    You testified on direct that people are often told not to

17  use their own name by Faruk and that they were told to use

18  innocuous titles like "Drinking Tea."

19  A    Uh-huh.

20  Q    And here every time Mr. Kurashev sent a financial

21  transaction it was in his own name.

22  A    Yes.

23  Q    Switching gears again to talk a little bit about

24  messaging, so once again, I'm asking this because the

25  Government has intimated in its filings and on direct that Mr.

Groff - Cross by Sinha

1    Kurashev's deletion of certain messages indicates some sort of

2    criminality.  So let's talk about deleting messages.  Knowing

3    that someone deleted a message doesn't tell you why they

4    deleted it; is that a fair statement?

5    A    Yes.

6    Q    And people can delete messages for many reasons?

7    A    Yes.

8    Q    Are you aware that Mr. Kurashev was persecuted in Russia?

9    A    Yes.  He says he was, yes.

10   Q    Are you aware that persecution can in general lead to

11   trauma?

12   A    Yes.

13   Q    Are you aware that trauma can make people hypervigilant?

14   A    Yes.

15   Q    And particularly if they're doing something against the

16   interests of the entity that persecuted them?

17   A    Yes.

18   Q    Faruk's activities were, let's say, against Russian

19   interests; would you agree with that?

20   A    Yes.

21   Q    And Mr. Kurashev was helping Faruk?

22   A    Yes.

23   Q    And Mr. Kurashev's parents are still in Russia; is that

24   right?

25   A    I don't know.

Groff - Cross by Sinha

1    Q    And are you aware that Mr. Kurashev is not a U.S. citizen?

2    A    Yes.

3    Q    So you are -- you are aware that he could get sent back

4    to -- he is not -- his status in the United States, his legal

5    status could be terminated?

6    A    Yes.

7    Q    Are you aware that he previously asked for asylum in

8    Germany?

9    A    Yes.

10   Q    And are you aware that he was there for several years?

11   A    Yes.

12   Q    And that Germany then sent him back to Russia?

13   A    Yes.

14   Q    And they sent him back to Russia because they told him

15   essentially Russia was now safe enough?

16   A    I don't know.  I think that's what he has said, yes.

17   Q    Subsequent to that, he then fled Russia to the United

18   States?

19   A    Yes.

20   Q    And he has been in the United States ever since?

21   A    Yes.

22   Q    I want to switch gears once again and just give me a

23   moment to check my timing.  I'll talk a little bit about

24   videos.  So the Government has again talked extensively about

25   videos Mr. Kurashev has watched.  One, sending a video doesn't

Groff - Cross by Sinha

1  mean that the sender necessarily viewed it; would you agree

2  with that?

3  A    I would think that I wouldn't send a video to somebody.

4  One of my associates or my close family members, if I hadn't

5  watched the video myself.  I've never experienced that, no.

6  Q    I appreciate you saying your personal practice, but what

7  I'm asking is in your 19 years of experience as a special

8  agent, would you agree with the idea that sending a video

9  doesn't necessarily tell you whether or not the sender watched

10  it?

11  A    Possibly, yes.

12  Q    And are you aware that Mr. Kurashev doesn't speak Arabic?

13  A    I think he was trying to learn.  There's videos on his

14  YouTube videos that he had watched about learning Syrian

15  Arabic.

16  Q    But are you aware that he does not speak Arabic?

17  A    I am not aware of that, no.

18  Q    And in portions of the discovery, the Government has

19  noted, and I believe that you were involved in the creation of

20  some of these, and in portions of discovery, the Government has

21  noted that Mr. Kurashev has watched something.  In making those

22  statements, what evidence did the Government use to conclude

23  that someone had watched a particular video?

24  A    So based on his actions, you know, we assess that he

25  probably watched the motorcycle video where Faruk Fayzimatov is

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

**SER-60**

Groff - Cross by Sinha

1    fundraising for a motorcycle and saying that these motorcycles

2    are for the fighters so that they're able to go directly to the

3    front of the frontlines, because shortly thereafter in

4    February, Fayzimatov is praising the defendant and writing his

5    name on the motorcycle.  He said, "If you send the money, then

6    I will write your name to the motorcycle," so that's an

7    indication that he is watching the videos.

8    Q    It's an indication that he "probably" watched the videos,

9    to use your own terminology, but that doesn't tell you

10   conclusively that he watched the video; is that correct?

11   A    Well, we also see cached images on his device that show

12   that his device is interacting with that video.  So we see the

13   motorcycle, we see a cached image of that video, so that's

14   another indication that he's likely watching that video, that

15   somebody -- for some reason his device is interacting with that

16   image, so that's another indication to us that he's likely

17   watching the video.

18   Q    So it's an indication that he's likely watching the video

19   because for some reason his device is interacting with it?

20   A    Yes.

21   Q    Let's talk a little bit about that.  Video services like

22   YouTube have algorithms that suggest content to the user; is

23   that correct?

24   A    Yes.

25   Q    And those same video services also have features called

Groff - Cross by Sinha

1   Autoplay that automatically plays content without the user

2   interacting with it.

3   A    Yes.

4   Q    So that means that after watching a video, platforms like

5   YouTube could then suggest another video and start playing it

6   even if there is no one there watching it; is that your

7   understanding?

8   A    That's my understanding, yeah, but this is on Muhajir,

9   this isn't on YouTube.

10  Q    I understand, I'm asking about video searches in general.

11  A    Okay.

12  Q    Let's talk about videos that someone has watched.  In

13  fact, even if you know a person has watched a video, that mere

14  fact does not tell you what they thought about the video.  Do

15  you agree with that?

16  A    Agreed, yes.

17  Q    That doesn't tell you why they watched the video?

18  A    No.

19  Q    So, for example, they could be watching it because the

20  video is newsworthy for some reason.

21  A    Possibly.

22  Q    They could be watching it because they're interested in

23  just the broader topic that the video touches on; is that fair?

24  A    Yes.

25  Q    Are you familiar with the colloquial term "research rabbit

Groff - Cross by Sinha

1  hole"?

2  A    Yes.

3  Q    Falling down a research rabbit hole, which we've all done,

4  is another reason why a person might be looking at a video.

5  A    Yes.

6  Q    Just a moment.  Doing a time check.  Looks like it's okay.

7         THE COURT:  Just so it's clear, the Court will need to

8  take a break for the court reporter.  I'll go to 12:30.  At

9  12:30 I would probably call a hard stop for today.

10        MS. SINHA:  Understood, Your Honor.  I think I could

11  get through a couple more things by then, but whenever the

12  Court wishes to do a hard stop, I'll stop immediately.

13        THE COURT:  I don't know if you heard me, I'll go

14  until 12:30.  So what I'm doing is extending the time because

15  the estimates were that we needed to take a break for the court

16  reporter in about 10 minutes.  We'll do that and come back and

17  go until 12:30.

18        MS. SINHA:  Understood, Your Honor.  Thank you.

19  BY MS. SINHA:

20  Q    All right.  Let's talk a little bit about conversations

21  Mr. Kurashev had with Faruk.  Are you aware of any

22  communications where Faruk and Mr. Kurashev are talking

23  explicitly about HTS, and if so, can you point out those

24  conversations?

25  A    It's a -- no.  We don't see them actually say the words

Groff - Cross by Sinha

1    "HTS," it's saying very similar to --

2    Q    No explicit reference in other words?

3    A    No.

4    Q    But you are aware that Mr. Faruk -- excuse me, that Mr.

5    Kurashev and Faruk discuss media coverage in Syria?

6    A    On Telegram?

7    Q    In general, in any of the conversations between Faruk and

8    Mr. Kurashev, are you aware that there are several instances

9    where they are talking about media coverage of Syria in the

10   context of lamenting the fact that there is not more coverage

11   of what's happening in Syria?

12   A    No, that's not -- I don't recall that, no.

13   Q    Among many things, one of the things that Faruk was doing

14   was reporting on activities in Syria; is that fair?

15   A    No.  He's reporting specifically on HTS activities in

16   Syria.

17   Q    So he was reporting on activities in Syria?

18   A    Yes, with regard to a designated foreign terrorist

19   organization.

20   Q    I understand that you want to get that point out, but what

21   I'm saying is he was reporting on activities in Syria, among

22   the many other things he was doing?

23   A    Yes, in Idlib, Syria, yes.

24   Q    Let's talk a little bit about money, switching gears

25   again.  One of the agents that helped investigate this case was

Groff - Cross by Sinha

1    an NYPD cyber operative which the Government refers to in its

2    materials C-Y-O-P; is that correct?

3    A    Correct.

4    Q    And I'll refer to that person as such.

5         That CYOP began investigating Faruk in mid January of

6    2019?

7    A    That's my understanding, yes.

8    Q    And then about a year and a half later, October 6, 2020,

9    that CYOP became aware that Faruk provided Mr. Kurashev's name

10   for the purpose of getting money?

11   A    Yes.

12   Q    And the last time that Mr. Kurashev sent money that is

13   relevant to this case is January of 2021?

14   A    Well, we also see the BITCOIN transaction in

15   February 2021, that we didn't know about until we searched his

16   devices.

17   Q    Okay.  With the exception -- thank you for that

18   clarification.

19        With the exception of the BITCOIN, the last time prior to

20   that that Mr. Kurashev had sent money was January of 2021?

21   A    Yes, that's my understanding.

22   Q    And Mr. Kurashev was then, as you testified, arrested on

23   February 19, 2021?

24   A    Correct.

25   Q    And Faruk was not designated as "Specially Designated

54

Groff - Cross by Sinha

1    Global Terrorist" until July of 2021?

2    A    Correct.  We used the evidence from this investigation

3    that shows Faruk Fayzimatov's connection to HTS.  We provided

4    that evidence to the State Department to assist them in

5    designating Faruk Fayzimatov.

6    Q    Right, but Faruk was not designated as a specially

7    designated global terrorist which comes with public notice of

8    such a thing until July of 2021?

9    A    Yes, that HTS --

10   Q    You've answered, thank you.

11        Let's see.  Let's talk a little bit about the extremist

12   mobilization factors the Government has mentioned.  I'm

13   referring specifically to the U.S. violent extremism

14   mobilization indicators referenced by the Government.  For the

15   Court's clarification that's at ECF 123, Page 7, and Footnote

16   10 on that same page.  Are you familiar with the document I'm

17   talking about?

18   A    Yes.

19   Q    Those indicators are a list of behaviors that its authors

20   believe could help determine whether an individual is preparing

21   to engage in or engaging in terrorist activities; is that

22   right?

23   A    Yes, and it's based on years and years of data of research

24   of actual terrorist activities.

25        THE COURT:  One at a time.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

**SER-66**

Groff - Cross by Sinha

1   BY MS. SINHA:

2   Q    You've answered my question.

3        My question is simply that the indicators are a list of

4   behaviors that the authors believe could indicate extremist

5   behavior; is that correct?

6   A    No.  They're actual indicators of individuals that

7   actually did conduct an attack.  So it's a compilation of

8   research over 20 years of research of multiple terrorist

9   attacks that occurred and active shooters of what did these

10  individuals do, what were the indicators, what were the warning

11  signs of those individuals leading up to the attack.  So it's a

12  compilation of data, and then it's a list of kind of what they

13  actually did.

14  Q    I think we're missing each other on this point.

15  A    Yeah, sorry about that.

16  Q    That's okay.  The indicators are a list of behaviors that

17  its authors believe, quote, "could help determine whether

18  individuals are preparing to engage in violent extremist

19  activities."

20  A    Yes.

21  Q    "Could" being the operative word.

22  A    Yes.

23  Q    The report does not claim that everyone meeting some or

24  all of its criteria are preparing to engage in or engaging in

25  extremist activities?

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Groff - Cross by Sinha

1    A    No.

2    Q    It's a list of activities that could or could not indicate

3    that kind of behavior?

4    A    Yes.

5    Q    And the list includes subjective terms such as "unusual

6    efforts" or "unusual purchases"; is that right?

7    A    Yes.

8    Q    In fact, that report itself emphasizes the very important

9    fact that many of the mobilization indicators included in this

10   booklet may also relate to constitutionally protected

11   activities.

12   A    Yes.

13        MS. SINHA:  And, Your Honor, the Court wishes to take

14   a break at 11:40; was that right?

15        THE COURT:  Well, how much time do you think you need?

16   I'm not trying to rush this.

17        MS. SINHA:  I totally understand.  Actually, I think I

18   have maybe five more minutes.

19        THE COURT:  I would do that, and then we'll take a

20   break.

21        MS. SINHA:  Understood, Your Honor.  Thank you.

22   BY MS. SINHA:

23   Q    So we've talked about indications of -- we've talked about

24   things that could or could not indicate radicalization, so

25   let's talk about radicalization itself.

Groff - Cross by Sinha

1    Even assuming arguendo that someone has been radicalized,

2    deradicalization is also possible for that person; is that

3    right?

4    A    Sure.

5    Q    And deradicalization involves many things, but one of

6    those things is divorcing them from the influences that

7    radicalized them in the first place?

8    A    Possibly, yeah.  It depends on exactly how much internal,

9    you know, radicalization has gone on.  How much are they just

10   internally interested in this topic, right?  That's a big

11   factor as well.

12   Q    Right.  But every deradicalization program that the U.S.

13   Government has talked about or proposed, all include, as a

14   necessary precursor, divorcing the person from the factor that

15   radicalized them; do you agree with that?

16   A    Possibly.  I mean, we have individuals that have been in

17   prison for 20 years that were convicted of terrorism acts who

18   have been divorced from the factors that had radicalized them,

19   and they come out of prison just as radicalized as they were

20   when they came in.  So I think it depends on a multiple of

21   factors that would help them deradicalize.

22   Q    Right, but the U.S. Government's position is that it's

23   necessary, but not sufficient for deradicalization, for someone

24   to be divorced from the factors that radicalized them in the

25   first place as an important thing?

58

Groff - Cross by Sinha

1   A    It would definitely help, yes.

2   Q    And the investigation of this case is ongoing?

3   A    Yes.

4   Q    And Mr. Kurashev has been in continuous federal custody

5   for two and a half years?

6   A    Yes.

7   Q    And you are aware that obviously aside from

8   attorney-client communications, all communications in this

9   district of federal inmates are monitored?

10  A    Yes.

11  Q    The prosecution can get recordings of their phone calls?

12  A    Yes.

13  Q    All of their phone calls, in fact, and their letters as

14  well?

15  A    Yes.

16  Q    And, in fact, the Government has been monitoring Mr.

17  Kurashev while he's in custody?

18  A    It's been difficult, but yes, we're trying, yes.

19  Q    And based on that scrutiny, the Government has no evidence

20  that Mr. Kurashev is currently interested in speaking with

21  Faruk; is that correct?

22  A    Well, I mean, it's still an ongoing investigation, and we

23  understand that one of Fayzimatov's strategies is to have clean

24  individuals, you know, to process things through.  So he

25  constantly tells the defendant, you know, reach out to, you

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

**SER-70**

59

Groff - Cross by Sinha

1    know, Albert Saaev, he's a clean individual.  So it's very

2    possible that there might be individuals that are unknown to us

3    who could contact him and provide him messages from Fayzimatov.

4    Q    Right.  So my question is, though, the Government -- does

5    the Government have any evidence, any evidence that you're

6    aware of, that Mr. Kurashev is currently interested in talking

7    to Faruk?

8    A    We don't know if he is interested or not.

9    Q    Do you have any evidence, is there any evidence that

10   you're aware of that indicates that he currently wishes to

11   speak with the person?

12   A    I don't have any -- not that he wish -- I mean, that he

13   wishes to speak to him?  I think all the Telegram evidence that

14   we have of him talking to him in the past could be evidence

15   that he wishes to speak to him.

16   Q    That is the Government's evidence of his past intent.

17   A    Yes.

18   Q    I'm asking is there any evidence that the Government has

19   that my client is currently interested in talking with Faruk?

20   A    That's a tough question because I don't know what he's

21   interested in.

22   Q    I'm simply asking --

23   A    Based on his Telegram communications in the past it

24   appears that he would be interested in talking to him if he had

25   the opportunity to.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

**SER-71**

Groff - Cross by Sinha

1    Q    But are you aware of any evidence at all that speaks to

2    any current interest, interest right now in speaking to Faruk?

3    A    I mean, we don't have anything, but I would base --

4    Q    That was my question.

5    A    Yeah.

6    Q    Are you aware of any evidence at all, are you aware of any

7    evidence at all that Mr. Kurashev is currently interested in

8    talking to any so-called "clean" individual that the Government

9    would be concerned about?

10   A    I mean, we base our assessments on the evidence that we

11   have, and the evidence we have is that he is interested in

12   talking to these individuals, right?  He was talking to them

13   from, you know, May, early in 2020 through 2021 right up to his

14   arrest, the day before his arrest.  So I would say that the

15   interest is there.  Now, we don't have any evidence that he

16   actually is doing it, but I would believe, based on your

17   evidence and our investigation, that he does have an interest

18   in doing so.

19   Q    Mr. Kurashev has been in custody for two and a half years.

20   So my question to you is, are you aware of any evidence that

21   Mr. Kurashev is currently interested in talking to any such

22   person?

23   A    I guess the word that's tripping me up is "interested."

24   We don't have any evidence that he is doing it, but I think

25   that our evidence proves that in the past he would want to talk

Groff - Cross by Sinha

1   to him, and so our assessment is that, yes, he would want to

2   continue.  He is a radicalized individual and that he would

3   want to talk to other radicalized individuals.

4   Q    Let me put it this way:  So the Government believes that

5   he is still currently interested in talking with such people

6   based on evidence that the Government collected of his

7   conversations that happened two and a half years ago?

8   A    Yes, absolutely.

9   Q    But the Government is not aware of any evidence from after

10  that period, from after his arrest, that indicates that?  You

11  are relying on the evidence from two and a half years ago; is

12  that correct?

13  A    Correct, yes.

14  Q    We just have a couple more questions to go.

15       So the Government -- let's talk a little bit about one of

16  the sureties, Andrey Kashirskiy.  The Government has no

17  information indicating that Andrey Kashirskiy is involved in

18  any criminal activity; do you agree with that?

19  A    I mean, we haven't investigated -- I don't know.  I

20  haven't looked into him, into his past.  I know that he's an

21  associate of Kurashev, that's about the extent of my knowledge

22  of Andrey Kashirskiy.

23  Q    So my question is are you aware of any evidence indicating

24  that the person I just mentioned is involved in any kind of

25  criminal activity?

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Groff - Cross by Sinha

1   A    I am not aware.

2   Q    And are you aware of any kind of information that

3   indicates that Andrey Kashirskiy is going to be involved in

4   criminal activity in the future?

5   A    I have no information.

6   Q    Okay.  And the Government has no information indicating --

7   the Government has no reason to believe that Andrey Kashirskiy

8   is not gainfully employed; is that right?

9   A    No, I have no information on that.

10   Q    Okay.  And the last few questions are about Dariya

11   Kondrotova.  So, again, similarly, the Government is not aware

12   of any information that Dariya Kondrotova is involved in any

13   kind of criminal activity; is that correct?

14   A    No, not to our knowledge.

15   Q    Or that Ms. Kondrotova is planning to be involved in any

16   criminal activity?

17   A    I have no information.

18   Q    And the Government has no information indicating that

19   Dariya Kondrotova would not immediately report any breaches of

20   pretrial conditions to Pretrial Services?

21   A    I have no information.

22          MS. SINHA:  Thank you.  Nothing further, Your Honor.

23          THE COURT:  All right.  Let me just check, how much

24   time does the Government anticipate for redirect?

25          MR. SLAVIN:  The Government doesn't need to do a

Groff - Cross by Sinha

1   redirect, Your Honor.

2           THE COURT:  So none?

3           MR. SLAVIN:  None.

4           THE COURT:  So this witness could be excused?

5           MR. SLAVIN:  Yes, Your Honor.

6           MS. SINHA:  Yes, Your Honor.

7           THE COURT:  You may be excused.  You may step down.

8       (Witness is excused.)

9           THE COURT:  We'll take a 15-minute break and come

10  back.  At that point we'll hear from the defense witness,

11  correct?

12          MS. SINHA:  Yes, Your Honor.

13          THE COURT:  All right.  Fifteen minutes.

14      (Recess taken from 11:43 a.m. through 12:08 p.m.)

15          THE CLERK:  Come to order.  Court is back in session.

16          THE COURT:  You may be seated.  We are back on the

17  record.  Apologies, I got detained, but you still had a half

18  hour total.  So the defense witness.  This is the witness for

19  whom you are using an interpreter?

20          MS. SINHA:  Yes, Your Honor.

21          THE COURT:  How are you planning to use the

22  interpreter?

23          MS. SINHA:  Your Honor, the interpreter would

24  interpret my question, and, in turn, interpret the witness's

25  response.

1        THE COURT:  So not simultaneous?

2        MS. SINHA:  No.  The interpreter can certainly

3    interpret my question simultaneously for the witness.

4        THE COURT:  Sometimes we have interpreter actually

5    right next to the witness in the witness box; is that what you

6    are contemplating?  I see the interpreter nodding.

7        MS. SINHA:  However the interpreter prefers is fine

8    with me.

9        THE COURT:  Let's call the witness first.

10       MS. SINHA:  Your Honor, we call Liana Kurasheva.

11       THE CLERK:  Please come forward, step into the witness

12   stand, remain standing and raise your right hand.

13       THE COURT:  Has this witness been asked about swearing

14   or affirming?

15       MS. HOPKINS:  No preference.

16       LIANA KURASHEVA, DEFENDANT'S WITNESS, SWORN.

17       THE COURT:  Why don't you complete your instructions

18   to the witness, Ms. Schultz.

19       THE CLERK:  Yes, Your Honor.  You may be seated.  Will

20   you please say and spell your first name for the record.

21       THE DEFENDANT:  Liana Kurasheva.

22       THE INTERPRETER:  Would the Court like the interpreter

23   to spell it?

24       THE COURT:  The witness should spell it with the

25   interpreter.

65

1    THE DEFENDANT:  L-I-A-N-A K-U-R-A-S-H-E-V-A.

2    THE COURT:  All right.  For the record, the

3    interpreter is?

4    THE INTERPRETER:  Yes, good morning, Eduardo

5    Hairullin, H-A-I-R-U-L-L-I-N, previously sworn Russian

6    interpreter.

7    THE COURT:  All right.  You may proceed.

8                    DIRECT EXAMINATION

9    BY MS. HOPKINS:

10   Q    Good morning, Ms. Kurasheva, or good afternoon.

11   A    Good morning.

12   Q    For the purposes of this examination, I would just ask

13   that you speak in the language that you are most comfortable so

14   that you can express yourself thoughtfully.

15        How do you know Murat Kurashev?

16   A    So are you asking -- we met in our home country in Russia,

17   in Kabardino-Balkarian; is that what you're asking?

18   Q    Yes, I'm perfectly fine.  I'll ask a follow up, which is

19   what is the nature of your relationship with him now?

20   A    Murat and I have been married for already 14 years, and

21   just like all married couples within the family, we have our

22   own problems that we try to resolve between the family.

23   Q    Okay.  You said you've been married for 14 years?

24   A    Yes.

25   Q    Would you say you know him pretty well?

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Kurasheva - Direct by Hopkins

1    A    Yes.

2    Q    How would you describe him; what is his personality like?

3    A    He is a very calm person, kind, very good natured, he is

4    an emotionally stable person.  How should I describe him?  He's

5    kind.  He's very kind.  Kindness is his best feature in the

6    world.

7    Q    Do you have an example of why you believe he's

8    particularly emotionally stable?

9    A    Well, my experience is derived from our marriage.  So he's

10   very calm when it comes to the children.  In situations where

11   other person would lose it, he is very calm.  And the reason I

12   consider him being emotionally stable is that during our family

13   quarrels he would always be calm and maintain his position.

14   Q    Before Murat was arrested, how was your family doing

15   financially?

16   A    Everything was fine with the money.  He was working, and

17   so we had everything we needed despite the fact that we had

18   just moved here two years before.

19   Q    Were you aware that he was donating money outside of your

20   home?

21   A    Yes.

22   Q    And did you have any concerns about him donating money?

23   A    No, never, because he would always help his friends that

24   were in need, his blood sisters that needed him.  So, he would

25   always help anybody who was in need.  It was impossible for him

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

67

Kurasheva - Direct by Hopkins

1   to say no to someone if someone asked for help.

2   Q    Did you want to go on?

3   A    No, not at this time.

4   Q    Did you and Murat discuss what was happening in Syria, the

5   Syrian conflict?

6   A    Naturally, he and I would talk about it within the family.

7   Obviously we felt compassion towards the Muslims that were

8   dying there.

9   Q    When you would talk about it, did he ever seem angry?

10  A    So, he was mostly saddened by the situation that the

11  Muslims ended up in, as opposing to getting angry.

12  Q    Did he ever talk to you about wanting to be mujahideen?

13  A    No, he never had those wishes or that he would sit down

14  with me and discuss them.

15  Q    Did he ever talk to you about wanting to fight physically

16  with people in Syria?

17  A    No.

18  Q    Did he ever talk to you about his concerns about the lack

19  of reporting or information coming out of Syria?

20  A    I don't know what he was saying, but he was saying that

21  they don't always tell the truth as to what things are

22  happening there in reality.

23  Q    When you say "they," who do you mean "they"?

24  A    The news.

25  Q    Were you or other people you know in the Muslim community

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

**SER-79**

Kurasheva - Direct by Hopkins

1   also upset about what was happening in Syria?

2   A    Of course when the war started everybody was very

3   compassionate, and, of course, everybody discussed the

4   situation amongst themselves, both men and women.

5   Q    Why was the Syrian conflict so important to you or people

6   in your community?

7   A    Because people were dying there, the Muslim people.  This

8   is our religion, and by this religion, we are obliged to be

9   compassionate to people.

10  Q    Are you obliged to physically fight or to kill other

11  people in order to defend your religion?

12  A    I don't know anything like that.

13  Q    And in your household and the way that you practice your

14  faith, do you or your husband believe in taking lives to defend

15  your faith?

16  A    No, no.

17  Q    Are you very confident in that answer?

18  A    Yes.

19  Q    Did Murat ever discuss with you buying weapons for the

20  fighters in Syria?

21  A    No, no, of course not.

22  Q    And just to be clear, since I have you here, in previous

23  hearings the Government and the defense have talked about a

24  video that was sent to you on New Years Eve, it was about a

25  90-minute video that was sent by a link.  Did you ever watch

69

Kurasheva - Direct by Hopkins

1    that video?

2    A    No, no, I haven't.

3    Q    Were there other things that Murat may have sent you that

4    you decided not to spend time watching?

5    A    He would send me some videos, like I would never read the

6    description to the video.  Some videos I would open, and as

7    soon as they start talking about religion, I would just close

8    and go about my business.  I didn't really pay much attention

9    to all this.

10   Q    Why was -- what was the reason that you were not

11   interested in those videos?

12   A    How should I put it?  This is all that we already gone

13   through.  The war has been going on for a long time and things

14   like that pain me.

15   Q    If Murat had approached you and told you that he was

16   interested in becoming a martyr, physically fighting in Syria,

17   how would you have reacted?

18   A    Naturally negatively, but he would not have said that.

19   Q    Why do you believe that?

20   A    Because of his personality, his lifestyle.

21   Q    What do you mean; can you explain a little bit more about

22   that?

23   A    Well, I believe that, for one, to be fighting in a war,

24   one would have to have this cruelty within one, and he doesn't

25   have any of that.  He's a soft-hearted person.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

**SER-81**

70

Kurasheva - Direct by Hopkins

1   Q    I want to ask you about Umma Life.  Are you familiar with

2   what Umma Life is?

3   A    My husband mentioned that.

4   Q    What did he tell you about it?

5   A    So he said that it was a program that was similar to

6   Instagram where Muslims could register and do the same thing

7   they would do on Instagram.

8   Q    Why would Umma Life be something he would be interested in

9   as opposed to just using Instagram?

10  A    Because he said that it would be just for the Muslims, for

11  the Muslim community, and it's good for the Muslim women, and

12  so in this way the Muslim women would avoid receiving messages

13  like it happens on Instagram when people send likes, this way

14  they would avoid that.  It's to avoid contact with men.

15  Q    Okay.  Is that something that's important to you?

16  A    It's what's important in Islam.

17  Q    I'm going to just briefly read to you the description of

18  Umma Life from their platform.  This is spelled U-M-M-A

19  L-I-F-E, Umma Life, two words.

20       "Umma Life Social Network was created as a response to the

21  Internet technology needs of Muslims and all adherence of

22  traditional values.  Even though the platform is called an

23  Islamic social network, we cordially welcome all users who

24  accept the user agreement regardless of their beliefs.

25       "The administration of the Islamic social network Umma

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

SER-82

Kurasheva - Direct by Hopkins

1  Life is not related to any group or hamat.  We are Muslim who

2  are completely independent of the influence of any forces or

3  movements.  We try the stay in line with prophetic methodology

4  and our religious beliefs in accordance with the practice of

5  first generation Muslims."

6      Is that your understanding of what the goal was behind the

7  platform?

8  A    Yes, yes.

9  Q    Did you ever have any reason to believe it was a part of

10 what this agent testified was an umbrella of HTS operations?

11 A    No, of course not.

12 Q    Has your husband ever talked to you about HTS?

13 A    I found out about this only here in the courtroom.

14 Q    Have you spoken with your husband about -- since he's been

15 in jail, about his feelings about this case?

16 A    Naturally, I have very many questions for him because I

17 don't understand what is happening, and he told me that

18 concerning everything that he is accused of, he didn't have any

19 of those intentions.

20 Q    Do you believe him?

21 A    Yes.

22 Q    What has been the focus of your conversations with him

23 while he's been in custody when you have jail calls with him?

24 A    The family and the children.

25 Q    Does he speak with your children over the phone?

Kurasheva - Direct by Hopkins

1   A    Yes.

2   Q    What are the nature of those conversations like?

3   A    About the fact that they miss each other, he is asking

4   them what is happening in the children's lives.

5   Q    Has he ever asked you in one of those calls to put him in

6   touch with anyone from his past?

7   A    No.

8   Q    Was he asking for updates about HTS activities in Syria?

9   A    No.

10  Q    Has he asked you for any updates about Faruk or whether or

11  not Faruk is still making media?

12  A    No.

13  Q    Has he asked you to make any donations to anyone on his

14  behalf?

15  A    No.

16  Q    You met with agents after your husband's arrest, correct?

17  A    So my husband was detained, and they came to our place on

18  the same day.

19  Q    And were you willing to speak with the agents?

20  A    I didn't have a choice, I did not know what was going on,

21  and I was just simply answering questions.

22  Q    About how long were you answering questions for, would you

23  say?

24  A    They came by around 10 a.m. and left about 7:00 p.m.

25  Q    So maybe eight or nine hours?

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Kurasheva - Direct by Hopkins

1  A    Yes, they were at our home, yes.

2  Q    Were you honest with them?

3  A    Yes, I told them everything as it was.  Everything I knew.

4  Q    Do you feel like you have anything to hide?

5  A    No.

6  Q    Do you feel like there's anything about your husband you

7  would need to hide to protect him?

8  A    No.

9  Q    If this Court ordered that you are a third-party

10  custodian, do you understand that you would have a commitment

11  to report any violations of any conditions by your husband?

12  A    Yes.

13  Q    Do you understand that that means even if he finds out his

14  mother is sick and he needs to borrow your phone to call her,

15  if he borrows your phone to call her, that would mean you would

16  need to report him and he could go back to jail?

17  A    Yes.  May I say something on my behalf?  The reason I go

18  for it is because I know my husband.  I know that he's going to

19  abide by the rules in order to be close to his children.  And

20  for me, it's not important to whether he talks to his family.

21  What's important is that he would be next to his children,

22  communicating with his children.

23  Q    If your husband is released, he would be confined to the

24  home, he would probably not be able to go out and work.  Do you

25  think he would be content to stay at home all day?

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Kurasheva - Direct by Hopkins

1    A    He's a very patient person, yes.

2    Q    And if you had to report your husband, you would be

3    willing to do so?

4    A    Absolutely, yes.

5    Q    Even if it meant you would lose the $20,000 from your

6    savings that you posted with the Court?

7    A    So what does it mean, your previous question was whether I

8    would report about his violations?

9    Q    Yes.

10   A    Yes, and if I will report about any violations, even if I

11   lose everything, because for me what's important is that my

12   family stays intact.  I don't want any problems.

13   Q    Do you mean for yourself if you were to be held in

14   contempt?

15   A    Yes, for me and for my children.

16   Q    So if you took an oath to the Court and signed a

17   declaration that you would uphold that responsibility, nothing

18   would make you break that?

19   A    No, I will not be able to violate it.

20   Q    Can you afford to lose the $20,000 that you posted?

21   A    Well, that money is very important for my family.  Having

22   been without a man for two and a half years, it's been very

23   difficult for me, and, of course, this money is important for

24   me and for my children.

25   Q    And you've been sitting in Court through all of Murat's

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Kurasheva - Cross by Slavin

1  bail hearings; right?

2  A    Yes.

3  Q    So you've heard all of the concerning things that the

4  Government has said about your husband?

5  A    Yes.

6  Q    Do you have any hesitation whatsoever that he will comply

7  with these conditions if he's released?

8  A    No, he will adhere to them, and he will fulfill them.

9       MS. HOPKINS:  I have no further questions.  If the

10 Court has questions.

11      THE COURT:  All right, is there any questioning from

12 the Government?

13      MR. SLAVIN:  Yes, Your Honor.

14                    CROSS-EXAMINATION

15 BY MR. SLAVIN:

16 Q    You said just now that you spoke to the FBI after your

17 husband's arrest; is that right?

18 A    Yes.

19 Q    And you told them the truth when you were speaking to

20 them?

21 A    Yes, as far as I could, yes, whatever I knew, I did.

22 Q    And one of the things that you told them was that you did

23 not have access to the bank account of your husband; is that

24 right?

25 A    Yes, he had a card.  I didn't have one of my own.  So he

Kurasheva - Cross by Slavin

1   was using it, but I knew the account number so that I could

2   make online purchases for myself.

3   Q    And you also said that you did not know that he was

4   sending money to Turkey or Syria?

5   A    I don't know where specifically he was sending that, but I

6   know he was sending.

7   Q    You told the FBI that you thought he was sending money to

8   family in Russia; is that right?

9   A    He did naturally send money to his family, yes, so that's

10  why I didn't think anything of it.

11  Q    Did you know that he was talking to people about moving to

12  Syria?

13  A    No.

14  Q    Did you know that he was asking Faruk about the costs of

15  buying or building a house in Syria?

16  A    No, he never discussed things like that with me.

17  Q    He didn't talk to you about his conversations about

18  starting a second family in Syria?

19  A    No.

20  Q    Did you know anything about your husband's use of crypto

21  currency, such as BITCOIN?

22  A    So he discussed with someone else, it was a video call,

23  that there was this alternative way to send money because he

24  would regularly send money to his family, but it was something

25  new to me, so I believe I heard it only once.

Kurasheva - Redirect by Hopkins

1   Q    Did he talk to you at all about using VPNs?

2   A    Well, there was nothing new about using VPNs because

3   during the pandemic everybody was using it.

4   Q    Do you use VPNs?

5   A    I had some, yes.

6   Q    Did you have access to his Telegram account?

7   A    No.

8   Q    So you've never had a chance to see any of the

9   conversations he was having on Telegram?

10  A    There was no need for me to go look through his phone.

11        MR. SLAVIN:  That's all I have.  Thank you.

12        THE COURT:  Anything further, Ms. Hopkins?

13        MS. SINHA:  Just two questions.

14                  REDIRECT EXAMINATION

15  BY MS. HOPKINS:

16  Q    Ms. Kurasheva, would you describe your husband as a

17  naturally curious person?

18  A    Yes.

19  Q    Was he often interested in the news and learning about new

20  things and technologies?

21  A    Yes.

22  Q    So would it be surprising to you at all that he might be

23  looking into new types of currency that's in the news that

24  people were talking about?

25  A    No.  My husband has various interests, and he likes to

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

**SER-89**

Kurasheva - Redirect by Hopkins

1    learn about everything new.

2              MS. SINHA:  Nothing further.

3              THE COURT:  All right.  Anything further from the

4    Government?

5              MR. SLAVIN:  No, Your Honor.

6              THE COURT:  All right.  Is this witness excused, then?

7              MR. SLAVIN:  Yes.

8              MS. SINHA:  Yes, Your Honor.

9              THE COURT:  All right.  You are excused.

10             (Witness is excused.)

11             THE COURT:  All right.  The Court does need to adjourn

12   today.  So the challenge is I am in enforcement proceedings

13   pretty much nonstop through the rest of the week and after

14   something else this afternoon, and those could continue until

15   next week after which I currently have a trial starting.  So

16   under these circumstances, next Monday is a Court holiday, so

17   we couldn't schedule oral argument then.  I don't think it's

18   fair to anyone, frankly, to schedule it during a lunch break on

19   Thursday or Friday when the Court otherwise would have time

20   because I would be taxing court staff and very limited court

21   reporting resources.  So under those circumstances, I think

22   written closing argument, assuming you want the Court to

23   resolve this sooner rather than later, makes the most sense.

24   So I would ask that you meet and confer, propose a schedule.

25             If you can decide who's going to get the transcript,

79

1    so that's on the docket, if you want to show up on the 16th for

2    closing argument, I would accommodate that as an option.  So

3    does that work for you, meet and confer, let me know by

4    Wednesday, close of business, what either your joint plan is or

5    your respective requests are.

6              MR. SLAVIN:  Yes, Your Honor.

7              MS. HOPKINS:  Yes, Your Honor.  Would you like us to

8    file a status report on the docket or just informally notify

9    the courtroom deputy what the plan is?

10             THE COURT:  It can be informal if you agree.

11             MS. SINHA:  Thank you, Your Honor.

12             THE COURT:  All right.  Thank you, all.  I'll look for

13   that.

14             THE CLERK:  Court is in recess.

15         (Proceedings adjourned at 12:46 p.m.)

16

17                   C E R T I F I C A T E

18

19       I certify that the foregoing is a true and correct

20   transcript of proceedings in the above-entitled matter.

21

22   MARYANN VALENOTI, RMR, CRR          October 8, 2023
     Official Court Reporter                  DATE
23   CA CSR #11266

24

25

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

**SER-91**

```
 1                 IN THE UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF CALIFORNIA
 2

 3    UNITED STATES OF AMERICA,
              PLAINTIFF,
 4
      VS.                          SACRAMENTO, CALIFORNIA
 5                                 NO. 2:21-CR-00040
      MURAT KURASHEV,              MON., JUNE 26, 2023
 6         DEFENDANT.              9:19 A.M.
      _____/
 7
                        TRANSCRIPT OF HEARING
 8       BEFORE THE HONORABLE KIMBERLY J. MUELLER, CHIEF JUDGE
                          ---oOo---
 9

10    APPEARANCES:

11     FOR THE PLAINTIFF:         UNITED STATES ATTORNEY
                                  501 I STREET, SUITE 10-100
12                                SACRAMENTO, CALIFORNIA  95814
                                  BY:  HEIKO P. COPPOLA
13                                ASSISTANT U.S. ATTORNEY

14                                U.S DEPARTMENT OF JUSTICE
                                  950 PENNSYLVANIA AVE. NW,
15                                WASHINGTON, DC 20530
                                  BY: DMITRIY SLAVIN
16                                ASSISTANT U.S. ATTORNEY

17     FOR THE DEFENDANT:         OFFICE OF THE FEDERAL
                                  DEFENDER
18                                801 I STREET, 3RD FLOOR
                                  SACRAMENTO, CALIFORNIA  95814
19                                BY: MEGAN TAYLOR HOPKINS
                                  CHRISTINA SINHA
20                                ASSISTANTS FEDERAL DEFENDER

21
       OFFICIAL COURT REPORTER:   KIMBERLY M. BENNETT,
22                                CSR, RPR, RMR, CRR
                                  501 I STREET
23                                SACRAMENTO, CA 95814

24
       PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
25     PRODUCED BY COMPUTER-AIDED TRANSCRIPTION
```

1          (CALL TO ORDER OF THE COURT, 9:19 A.M.)

2              THE CLERK:  CALLING CRIMINAL CASE 21-40; UNITED

3    STATES VERSUS MURAT KURASHEV.

4        THIS IS ON FOR A MOTION HEARING AND STATUS CONFERENCE.

5              THE COURT:  ALL RIGHT.  APPEARANCES, PLEASE, FOR THE

6    GOVERNMENT.

7              MR. COPPOLA:  GOOD MORNING, YOUR HONOR.  HEIKO

8    COPPOLA AND DMITRIY SLAVIN ON BEHALF OF THE UNITED STATES.

9              THE COURT:  GOOD MORNING TO EACH OF YOU.

10       AND FOR MR. KURASHEV.

11             MR. HOPKINS:  GOOD MORNING, YOUR HONOR.  MEGAN

12   HOPKINS, CHRISTINA SINHA HERE FOR MURAT KURASHEV, WHO IS

13   PRESENT, IN CUSTODY, FOR TODAY'S CONTINUED HEARING ON THE

14   GOVERNMENT'S MOTION TO REVOKE.

15             THE COURT:  ALL RIGHT.  GOOD MORNING, MS. HOPKINS AND

16   MS. SINHA.

17       AND ASSISTING.

18             INTERPRETER:  GOOD MORNING.  EDUARD HAIRULLIN,

19   PREVIOUSLY SWORN RUSSIAN INTERPRETER.

20             THE COURT:  ALL RIGHT.  GOOD MORNING TO YOU.

21       THIS IS ON FOR THE MOTION BUT ALSO A STATUS CONFERENCE.

22   I'M GOING TO ADDRESS THE MOTION FIRST BECAUSE THAT COULD AFFECT

23   THE STATUS.

24       SO I HAVE, AT THIS POINT, CAREFULLY REVIEWED THE ENTIRE

25   RECORD RELATED TO THE GOVERNMENT'S MOTION TO REVOKE THE

1    MAGISTRATE JUDGE'S RELEASE ORDER.  IN PARTICULAR, SINCE OUR

2    LAST HEARING LAST WEEK, I HAVE REVIEWED THE VIDEOS THE

3    GOVERNMENT PROVIDED TO THE COURT, THE THREE-MINUTE VIDEO, THE

4    90-MINUTE VIDEO?  I DID NOT WATCH THE 90-MINUTE VIDEO FROM

5    START TO FINISH, BUT I DID WATCH SIGNIFICANT PORTIONS OF IT AND

6    SATISFIED MYSELF.  I WATCHED THROUGHOUT SO THAT I THINK I HAVE

7    A GRASP OF THE CONTENT, AT LEAST VISUALLY.  THE GOVERNMENT

8    PROVIDED A TRANSLATION OF THE THREE-MINUTE VIDEO AND A PARTIAL

9    TRANSLATION OF THE 90-MINUTE VIDEO.  IT ALSO PROVIDED A RECORD

10   OF A VERY BRIEF TEXT EXCHANGE WITH MR. KURASHEV'S WIFE.

11      SO THE DEFENSE IS AWARE OF ALL THE INFORMATION I RECEIVED

12   FROM THE GOVERNMENT, AND HAS NOT OBJECTED TO ANY OF THE

13   TRANSLATION, CORRECT?

14           MR. HOPKINS:  NO, YOUR HONOR.  BUT I DO NOTE THAT

15   WITH REGARD TO THE 90-MINUTE VIDEO, IT DOESN'T APPEAR THERE IS

16   AS MUCH A TRANSLATION AS A SUMMARY FROM THE GOVERNMENT'S

17   AGENT OF WHAT THE VIDEO CONTAINS RATHER THAN A VERBATIM OF

18   WHAT'S BEING SAID.

19           THE COURT:  FAIR ENOUGH.  IN FACT, IT'S TITLED A

20   SUMMARY.

21           MR. HOPKINS:  YES.

22           THE COURT:  BUT NO DISAGREEMENT WITH THAT AS A

23   SUMMARY OF WHAT --

24           MR. HOPKINS:  NO, YOUR HONOR.

25      WITH REGARD TO THE TEXT EXCHANGE, I WOULD NOTE THAT AFTER

1    THE, IT IS ALMOST 2:00 A.M. WHAT'S WRONG WITH YOU GOING, THE

2    TEXT CONTINUES THE FOLLOWING DAY AT 11:35 A.M. AND IS ON A

3    DIFFERENT SUBJECT.  I DON'T THINK IT'S RELEVANT TO THE VIDEO

4    EXCHANGE, IT'S JUST ABOUT WHETHER OR NOT HE'S GOING TO GO GET

5    BREAKFAST, AND WHETHER OR NOT THERE'S BEEN A DEPOSIT IN THE

6    ACCOUNT.  BUT, OTHERWISE, WE DON'T OBJECT.  I JUST DON'T THINK

7    THE SECOND PART OF THAT TEXT EXCHANGE HAS ANY RELEVANCE, BUT I

8    DON'T THINK IT'S HARMFUL FOR THE COURT TO CONSIDER THE FACT

9    THAT THEY'RE COMMUNICATING.

10          THE COURT:  ALL RIGHT.  UNDERSTOOD.

11       IT IS VERY BRIEF, A FEW WORDS HERE AND THERE, AND -- YEAH,

12   I'M NOT DRAWING ANY SIGNIFICANT CONCLUSIONS FROM THAT EXCHANGE

13   EXCEPT THE FACT THAT THE VIDEO WAS TRANSMITTED.

14          MR. HOPKINS:  YES, YOUR HONOR.

15          THE COURT:  THAT'S NOT DISPUTED.

16          MR. HOPKINS:  I DID DO SOME TIME CALCULATIONS.  IT

17   APPEARS THE VIDEO WAS SENT AT 1:24 A.M., AND THE RESPONSE CAME

18   FROM MRS. KURASHEV AT 1:25, ONE MINUTE LATER.  AND MY

19   COMMUNICATIONS WITH HER, SHE SAYS SHE DID NOT WATCH THE VIDEO,

20   DOESN'T KNOW ANYTHING ABOUT THE VIDEO, AND CAN'T SPECIFICALLY

21   RECALL THIS EXCHANGE OTHER THAN IT WAS NEW YEAR'S EVE AND SHE

22   DECIDED TO GO TO BED BEFORE THE BALL DROP.

23          THE COURT:  THAT CHRONOLOGY ISN'T DISPUTED?  IN NO

24   WAY SHE COULD HAVE WATCHED THE 90-MINUTE VIDEO.

25          MR. COPPOLA:  I BEG YOUR PARDON, YOUR HONOR?

1          THE COURT:  THERE IS NO WAY MRS. KURASHEV COULD HAVE

2    WATCHED THE 90-MINUTE VIDEO BY THE TIME SHE SENT THE TEXT

3    RESPONSE.

4          MR. COPPOLA:  LIKELY NOT, NO.

5          THE COURT:  ALL RIGHT.  THE FACT MR. KURASHEV SENT IT

6    BY TEXT, THAT'S UNDISPUTED.

7          MR. HOPKINS:  YES.

8          THE COURT:  SO HERE I'M GOING TO ISSUE A BENCH ORDER

9    BECAUSE OF THE -- I BELIEVE THAT MR. KURASHEV DESERVES A

10   RESPONSE, THE GOVERNMENT DESERVES A RESPONSE AS WELL, AS

11   PROMPTLY AS POSSIBLE GIVEN THE NATURE OF THE MOTION, AND THE

12   FACT THAT THE MAGISTRATE JUDGE PREVIOUSLY GRANTED RELEASE, AND

13   THAT CASH BONDS AND TWO VEHICLES HAVE BEEN POSTED.

14     THAT SAID, HAVING CAREFULLY REVIEWED THE ENTIRETY OF THE

15   RECORD, THE PARTIES' BRIEFS, THE VIDEOS, THE PRETRIAL SERVICES

16   REPORTS, ALL OF THEM, THE AUDIO OF THE MOST RECENT PROCEEDING

17   IN FRONT OF THE MAGISTRATE JUDGE, AND HAVING HEARD ARGUMENT

18   FROM THE PARTIES AND SOME CLARIFICATION HERE THIS MORNING, I AM

19   GOING TO GRANT THE GOVERNMENT'S MOTION IN PART BASED ON

20   DANGEROUSNESS ALONE.  AND HERE IS MY REASONING.  I'M GOING TO

21   TAKE SOME TIME TO EXPLAIN MYSELF.  IF THE GOVERNMENT WISHES A

22   FORMAL ORDER, IT CAN OBTAIN A TRANSCRIPT AND PREPARE A PROPOSED

23   WRITTEN ORDER.

24     SO HERE THE DEFENDANT HAS PROFFERED EVIDENCE TO REBUT THE

25   PRESUMPTION THAT NO CONDITION OR COMBINATION OF CONDITIONS WILL

1    REASONABLY ASSURE THE APPEARANCE OF MR. KURASHEV AS REQUIRED

2    AND THE SAFETY OF THE COMMUNITY.  THAT'S WITH REFERENCE TO 18

3    US CODE SECTION 3142(E)(3)(B).  THE PRESUMPTION REMAINS AS AN

4    EVIDENTIARY FINDING MILITATING AGAINST RELEASE, BUT TO BE

5    WEIGHED ALONG WITH OTHER EVIDENCE RELEVANT TO THE FACTORS SET

6    FORTH IN SECTION 3142(G).  THE BURDEN OF PRODUCTION IS ON THE

7    DEFENDANT, BUT AT ALL TIMES THE BURDEN OF PERSUASION REMAINS

8    WITH THE GOVERNMENT.

9        WITH RESPECT TO FLIGHT RISK, I JUST WANT TO CLARIFY, I'M

10   NOT GRANTING THE GOVERNMENT'S MOTION WITH RESPECT TO FLIGHT

11   RISK.  EVEN THOUGH THE BURDEN IS LOWER THERE, PREPONDERANCE OF

12   THE EVIDENCE FOR THE GOVERNMENT, I DON'T BELIEVE THE RECORD

13   SHOWS THAT NO CONDITIONS OF RELEASE ARE AVAILABLE TO REASONABLY

14   ASSURE MR. KURASHEV'S APPEARANCE, EVEN THOUGH THE RECORD

15   SUGGESTS, WITHOUT A LOT OF DETAIL BEFORE THE COURT, THAT

16   MR. KURASHEV WAS APPARENTLY SEARCHING FLIGHTS TO OTHER

17   COUNTRIES OUTSIDE THE US PRIOR TO HIS ARREST.  THERE IS NOTHING

18   TO SUGGEST HE WAS TAKING ACTIVE STEPS TO DEPART THE COUNTRY, IF

19   HE EVEN COULD HAVE, GIVEN THAT THERE IS AN ICE HOLD IN EFFECT.

20   THAT DOES NOT FACTOR INTO THE COURT'S CONCLUSION WITH RESPECT

21   TO FLIGHT RISK, BUT THERE IS AN ICE HOLD OUT THERE.

22       I NOTE THAT THE MAGISTRATE JUDGE APPROVED RELEASE

23   CONDITIONS INCLUDING LOCATION MONITORING, HOME DETENTION,

24   RESTRICTION TO INTERNET ACCESS.  I KNOW THE GOVERNMENT

25   QUESTIONS THE FEASIBILITY OF THOSE RESTRICTIONS.  THE DEFENSE

1   SAYS THEY HAVE WORKED IN OTHER DIFFERENT TYPES OF CASES.

2       I ALSO NOTE THAT MR. KURASHEV WOULD BE REQUIRED TO

3   SURRENDER ALL TRAVEL DOCUMENTS, OR, IF HE SAYS HE DOESN'T HAVE

4   THEM, TO CERTIFICATE THAT HE DOESN'T HAVE THEM.  ALSO, THE

5   POSTING OF THE CASH BONDS, THE TITLE TO TWO VEHICLES, I BELIEVE

6   ALL OF THOSE CONDITIONS GO A LONG WAY TO PROVIDING AN ASSURANCE

7   THAT MR. KURASHEV WOULD APPEAR AT PROCEEDINGS.

8       I BELIEVE THE HOME DETENTION CONDITION, AS ADOPTED BY THE

9   MAGISTRATE JUDGE AND AS APPEARING ON THE COURT'S DOCKET AT ECF

10  93, I BELIEVE IT IS, WOULD NEED TO BE REFINED TO CLARIFY THAT

11  PRETRIAL SERVICES PRE-APPROVAL WOULD BE REQUIRED FOR ANY TYPE

12  OF DEPARTURE FROM THE HOME.  THE DEPARTURE, THE VERY SPECIFIC

13  DETAILS, I'M NOT CERTAIN THE CONDITION AS CURRENTLY WRITTEN IS

14  AS CLEAR AS WOULD BE REQUIRED HERE.  WHILE OF COURSE

15  MR. KURASHEV WOULD BE ALLOWED, IF HE WERE EVER RELEASED, TO --

16  TO PARTICIPATE IN RELIGIOUS SERVICES, TO FOLLOW HIS RELIGION, I

17  DO BELIEVE DURATION COULD BE AN ISSUE HERE, GIVEN SOME OF

18  WHAT'S BEFORE THE COURT.

19      SO THOSE CONDITIONS, ALONG WITH THE POSTING OF THE BONDS,

20  AND THE FACT THAT MR. KURASHEV'S WIFE IS HERE WITH FOUR

21  CHILDREN, AND NO INDICATION THE ENTIRE FAMILY WAS PLANNING TO

22  LEAVE, IN FACT, BOTH MR. KURASHEV AND HIS WIFE ARE PENDING

23  ASYLUM PROCEEDINGS, I JUST -- ON BALANCE, I THINK ALL OF THOSE

24  CONDITIONS, WITH SOME REFINING, COULD -- COULD OVERCOME A

25  PRESUMPTION THAT MR. KURASHEV IS A FLIGHT RISK AS CONTEMPLATED

1    BY THE STATUTE.

2        THAT SAID, I MOVE ON TO CONSIDER WHETHER OR NOT THE

3    PRESUMPTION IS OVERCOME WITH RESPECT TO DANGEROUSNESS.  AGAIN,

4    THINKING ABOUT THE FACTORS SET FORTH IN 18 US CODE

5    SECTION 3142(G), HERE THE GOVERNMENT HAS A HIGHER BURDEN, BUT I

6    BELIEVE IT'S MET.  FOR THESE REASONS, HAVING CAREFULLY REVIEWED

7    THE NINTH CIRCUIT'S CASE IN HIR, MORE SERIOUS FACTS OVERALL,

8    BUT THE WAY IN WHICH THE NINTH CIRCUIT SET OUT ITS ANALYSIS HAS

9    GUIDED THIS COURT IN THINKING THROUGH THE APPLICATION OF THE

10   FACTORS HERE.

11       SO, FIRST, THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

12   CHARGED IS EXTREMELY SERIOUS, WITHOUT QUESTION.  AND

13   SECTION 3142(G)(1) SPECIFICALLY REQUIRES THE COURT TO CONSIDER,

14   AS HERE, THE FACT THAT THE OFFENSE IS A -- AN OFFENSE CHARGING

15   A CRIME OF TERRORISM, SPECIFICALLY ALLEGING THAT MR. KURASHEV

16   KNOWINGLY ATTEMPTED TO PROVIDE MATERIAL SUPPORT OR RESOURCES TO

17   A FOREIGN TERRORIST ORGANIZATION, AND THAT IS KNOWING THE

18   ORGANIZATION, HTS, HAYAT TAHRIR AL-SHAM, WAS A TERRORIST

19   ORGANIZATION ENGAGED IN TERRORIST ACTIVITY.  THAT'S THE CHARGE.

20       OF COURSE MR. KURASHEV IS PRESUMED INNOCENT UNTIL PROVEN

21   GUILTY, AND THE COURT GIVES GREAT WEIGHT.  THE COURT DOES NOT

22   IN ANY WAY CONCLUDE OTHERWISE.  IT IS NOT FOR THIS COURT TO

23   MAKE ANY DETERMINATION RESULTING IN THE ULTIMATE RESOLUTION OF

24   THE INDICTMENT MR. KURASHEV FACES.  IF CONVICTED, HE WOULD FACE

25   UP TO 20 YEARS IN FEDERAL PRISON.  ON BALANCE, THE NATURE OF

THE CHARGE ALONE, THOUGH, DOES WEIGH IN FAVOR OF FINDING DANGEROUSNESS.

SECONDLY, HERE, AS WELL, THE COURT IS KEENLY AWARE OF ITS OBLIGATION NOT TO GIVE UNDUE WEIGHT TO THE EVIDENCE BEFORE THE COURT, ALL THINGS CONSIDERED, BUT WEIGHT OF THE EVIDENCE, WHILE THE LEAST IMPORTANT FACTOR, STILL DOES GUIDE THE COURT. AS IT DID THE COURT IN HIR, THE TRIAL COURT AND THE REVIEWING COURT IN HIR, IT GUIDES THE COURT IN RESOLVING THE GOVERNMENT'S MOTION.

AND HERE THE COURT FINDS THAT SIGNIFICANT EVIDENCE WEIGHS AGAINST MR. KURASHEV AND IN THE GOVERNMENT'S FAVOR WITH RESPECT TO DANGEROUSNESS. I TAKE ACCOUNT OF THE TOTALITY OF THE CIRCUMSTANCES. YOU ARGUED I SHOULD, AND I THINK FAIRLY SO. AND I GIVE PARTICULAR WEIGHT TO THE FOLLOWING INFORMATION IN THE RECORD BEFORE THE COURT, THAT IS:

MR. KURASHEV'S COMMUNICATIONS WITH MR. FAYZIMATOV. EVEN WITHOUT ANY REFERENCE TO HTS, EVEN ACCEPTING THE DEFENSE' ARGUMENT THAT THERE IS NOTHING DIRECTLY INDICATING THAT MR. KURASHEV WAS EXPRESSING SUPPORT FOR HTS, I NOTE THE IMAGES IN THE VIDEO THAT INCLUDE HTS IMAGES, BUT JUST THE FACT OF MR. KURASHEV'S COMMUNICATIONS WITH MR. FAYZIMATOV, INCLUDING STATEMENTS INDICATING HIS DESIRE TO BE A MARTYR, A SHAHID, INDICATING, APPARENTLY, HIS DESIRE TO JOIN THE FIGHT IN SYRIA, BUT IF HE COULDN'T HE WAS GOING TO SEND FUNDS. HIS COMMUNICATIONS WITH MR. FAYZIMATOV INDICATING OR DISCUSSING WAR

1    BEING AN EXPENSIVE PLEASURE IN THE CONTEXT OF DISCUSSING FUNDS

2    IN THE AMOUNT OF $200,000.

3         THE MEDIA CONTENT THAT MR. KURASHEV ACCESSED, INCLUDING THE

4    THREE-MINUTE AND THE 90-MINUTE VIDEOS, I CANNOT CONCLUDE -- AS

5    A LAY JUDGE, WITHOUT EXPERT INTERPRETATION OF WHAT'S GOING ON

6    IN THOSE VIDEOS, I CANNOT CONCLUDE THEY'RE ANYTHING LIKE A RAP

7    VIDEO, WITH THE TRANSLATIONS THAT THEY PROVIDE IMAGERY OF

8    FIGHTING IN THE FIELD, PRIMARILY MASKED PERSONS, ARMED WITH

9    AUTOMATIC WEAPONS, SHOOTING AT BUILDINGS, THERE ARE PICTURES OF

10   BLOODIED VICTIMS, AND THEN IN THE LONGER VIDEO THERE IS A

11   PERSON PROVIDING PERIODIC EXPLANATIONS OR EXHORTATIONS, AND SO

12   THE CONTENT OF THE VIDEOS THEMSELVES, I BELIEVE, IS -- WEIGHS

13   HEAVILY AGAINST MR. KURASHEV.

14        THAT, COMBINED WITH THE TRANSFER OF APPROXIMATELY $13,000,

15   INCLUDING $200 IN BITCOIN, FOLLOWED BY THE SUGGESTION OF SOME

16   EFFORTS TO COVER TRACKS, ON BALANCE I CANNOT CONCLUDE THAT THE

17   RECORD BEFORE ME SUPPORTS THE CLEAR CONCLUSION THAT

18   MR. FAYZIMATOV WAS ENGAGED ONLY IN MEDIA ACTIVISM.

19        SO WHILE RECOGNIZING THE COMPLEXITY OF THE CIRCUMSTANCES IN

20   WHICH MR. KURASHEV FINDS HIMSELF, AND AGAIN NOTING HE'S --

21   THERE IS A PRESUMPTION OF INNOCENCE, THERE IS NOTHING BEFORE

22   THE COURT EITHER TO SUGGEST THAT HE CLEARLY HAS DISTANCED

23   HIMSELF FROM MR. FAYZIMATOV OR HTS, THE DOWNPLAYING OF THE

24   VIDEO CONTENT, JUST NOTHING SUGGESTS TO THE COURT THAT THE

25   SECOND FACTOR IS OVERCOME.  AND SO I DO FIND THAT BY CLEAR AND

1    CONVINCING EVIDENCE, THAT FACTOR, THE WEIGHT OF THE EVIDENCE,

2    WEIGHS IN FAVOR OF FINDING DANGEROUSNESS.

3        THE THIRD FACTOR, THE HISTORY AND CHARACTERISTICS OF

4    MR. KURASHEV, IN MANY RESPECTS WEIGHS AGAINST A FINDING OF

5    DANGEROUSNESS, OR IS AT LEAST NEUTRAL.  IT'S UNDISPUTED

6    MR. KURASHEV HAS NO CRIMINAL HISTORY, HE HAS A POSITIVE

7    EMPLOYMENT HISTORY, HE WAS, AT ONE POINT, MAKING SIGNIFICANT

8    FUNDS, HE IS THE FATHER OF FOUR CHILDREN, THERE IS NOTHING TO

9    SUGGEST HE DOESN'T TAKE RESPONSIBILITY FOR THEM; ALTHOUGH, HE

10   WAS SENDING FUNDS THAT COULD HAVE BEEN SPENT TOWARDS THEIR

11   CARE, INCLUDING THE FOURTH SPECIAL NEEDS CHILD.

12       THE -- WITH RESPECT TO THE THIRD FACTOR, I DO THINK IT'S

13   SIGNIFICANT THAT MR. KURASHEV WAS ON RELEASE IN THIS COUNTRY

14   PENDING RESOLUTION OF HIS ASYLUM CASE, AND HIS COMMUNICATIONS

15   WITH MR. FAYZIMATOV, AND THE TRANSFER OF FUNDS TO HIM AT LEAST

16   CALL HIS JUDGMENT INTO QUESTION.  AND SO, AT BEST, THAT FACTOR

17   WEIGHS IN MR. KURASHEV'S FAVOR, IT COULD BE NEUTRAL GIVEN THAT

18   LAST BIT OF INFORMATION.

19       IN TERMS OF THE FOURTH FACTOR, THE NATURE AND SERIOUSNESS

20   OF THE DANGER TO THE COMMUNITY THAT WOULD BE POSED BY

21   MR. KURASHEV'S RELEASE, AS WE CLARIFIED AT THE LAST HEARING,

22   UNDER HIR, THE COURT MAY CONSIDER DANGER TO A FOREIGN

23   COMMUNITY.  THE GOVERNMENT CLARIFIED THE COMMUNITY THAT'S

24   RELEVANT HERE IS SYRIA.  AND I DO FIND, GIVEN THE TRANSFER OF

25   FUNDS WITH THE -- THE INFERENCES THAT THEY WOULD BE USED IN

1    THAT COMMUNITY, I FIND THAT THE GOVERNMENT HAS PROVIDED CLEAR

2    AND CONVINCING EVIDENCE THAT MR. KURASHEV WAS WILLING TO

3    SUPPORT ACTIVITIES THAT POSED A DANGER TO THE COMMUNITY -- A

4    COMMUNITY IN SYRIA.

5        SO I DO FIND THAT THE GOVERNMENT HAS MET ITS BURDEN BY

6    CLEAR AND CONVINCING EVIDENCE TO SHOW THAT MR. KURASHEV POSES A

7    DANGER; THEREFORE, I MOVE ON TO CONSIDER WHETHER OR NOT THE

8    GOVERNMENT ALSO HAS MET ITS BURDEN OF SHOWING THERE IS NO

9    CONDITION OR COMBINATION OF CONDITIONS TO REASONABLY ASSURE THE

10   SAFETY OF THE COMMUNITY.

11       CERTAIN CONDITIONS WOULD HAVE SOME EFFECT IN OVERCOMING

12   DANGEROUSNESS, BUT I DO BELIEVE, EVEN CONSIDERING THE DETAILED

13   LIST OF CONDITIONS THE MAGISTRATE JUDGE APPROVED, THEY ARE NOT

14   SUFFICIENT IN TWO RESPECTS:  I DO NOT BELIEVE THE AMOUNT OF

15   BOND IS SUFFICIENT, PARTICULARLY GIVEN THE INDICATION THAT

16   THERE IS SOME UNEXHAUSTED BOND RESOURCES, AND ALSO THE LACK OF

17   ANY NEUTRAL THIRD-PARTY CUSTODIAN BEING IDENTIFIED ARE HURDLES

18   FOR MR. KURASHEV.  I DON'T KNOW THAT THEY COULD BE OVERCOME.  I

19   WOULD NEED MORE INFORMATION, ULTIMATELY, TO MAKE THAT

20   DETERMINATION.

21       MOST IMPORTANTLY, I THINK, IS THE FACTOR THAT'S DISCUSSED

22   IN HIR, WHERE THE FACTS WERE WORSE FOR THE DEFENDANT, NO

23   QUESTION, BUT HERE I STILL BELIEVE THERE IS A QUESTION ABOUT

24   MR. KURASHEV'S ABILITY OR WILLINGNESS TO COMPLY IN GOOD FAITH

25   WITH CONDITIONS, GIVEN THE WEIGHT OF THE EVIDENCE FACTORS THAT

1   I ALREADY DISCUSSED; HIS SENDING OF FINANCIAL SUPPORT TO AN

2   INDIVIDUAL WHO CANNOT REASONABLY BE CHARACTERIZED AS ONLY

3   ENGAGING IN MEDIA ACTIVISM, WHAT WE HERE WOULD CALL FIRST

4   AMENDMENT ACTIVITIES, HE DID SO WHILE SUBJECT TO MONITORING BY

5   IMMIGRATION AUTHORITIES, WHILE SEEKING ASYLUM, JEOPARDIZING HIS

6   IMMIGRATION STATUS, WITH POTENTIALLY DIRE CIRCUMSTANCES FOR

7   HIS -- DIRE CONSEQUENCES FOR HIS FAMILY; THE TAKING OF STEPS TO

8   COVER HIS TRACKS; THE AMOUNT OF MONEY, WHILE NOT ASTRONOMICAL,

9   WAS NOT INSIGNIFICANT FOR HIS FAMILY OF FOUR.

10      THE GOVERNMENT ARGUES THAT MR. KURASHEV WAS RADICALIZED.  I

11   DON'T KNOW THAT AS A LAY JUDGE I CAN REACH A CLEAR CONCLUSION,

12   BUT HE WAS EITHER RADICALIZED OR SERIOUSLY BLINDED BY CONTENT

13   HE WAS VIEWING AND HIS OWN BELIEFS AND HE CROSSED A LINE.  AND

14   NOTHING BEFORE THE COURT CURRENTLY ALLOWS THE COURT TO CONCLUDE

15   THAT HE UNDERSTANDS THAT AND HAS MADE A COURSE CORRECTION SUCH

16   THAT IT CAN COUNT ON HIS GOOD FAITH COMPLIANCE WITH THE

17   CONDITIONS OFFERED.

18      SO I DO CONCLUDE THAT THE RECORD SUPPORTS GRANTING THE

19   GOVERNMENT'S MOTION AS TO DANGEROUSNESS, NO CONDITIONS OR

20   COMBINATION OF CONDITIONS BEFORE THE COURT WOULD REASONABLY

21   ASSURE THE SAFETY OF THE RELEVANT COMMUNITY.

22      SO THAT IS THE COURT'S BENCH ORDER.  WITH THAT, AGAIN, IF

23   THE GOVERNMENT WANTS IT IN WRITTEN FORMAT IT CAN OBTAIN THE

24   TRANSCRIPT, PRESENT SOMETHING THAT FAITHFULLY FOLLOWS THAT

25   TRANSCRIPT WITHOUT ANY ADDITIONAL INFORMATION.

```
 1        SO, WITH THAT, WHAT IS THE PARTIES' REQUEST WITH RESPECT TO

 2   A STATUS?

 3             MR. HOPKINS:  YOUR HONOR, JUST ONE QUESTION FOR

 4   CLARIFICATION FOR THE BENCH ORDER.

 5        THE COURT INDICATED THE BOND WAS INSUFFICIENT.  DOES THE

 6   COURT HAVE IN MIND WHAT THE DEFENSE MIGHT PRESENT?  AS I

 7   INDICATED PREVIOUSLY, THERE ARE ADDITIONAL BOND RESOURCES

 8   AVAILABLE.  IF WE NEED TO FASHION A DIFFERENT TYPE OF BOND WITH

 9   GREATER RESOURCES, I BELIEVE WE CAN DO THAT.

10             THE COURT:  I CAN'T -- THIS IS WHERE I CAN'T -- THERE

11   WERE SOME ALLUSIONS, BUT WITHOUT KNOWING -- I CAN'T SET A

12   NUMBER WITHOUT TAKING ACCOUNT OF WHAT'S AVAILABLE.  THE

13   SUGGESTION WAS THERE IS MORE AVAILABLE.  SO THERE WOULD HAVE TO

14   BE MORE, PLUS THIRD-PARTY CUSTODIAN, PLUS ADDRESSING THE GOOD

15   FAITH QUESTION.  THOSE ARE THE THREE THINGS THAT THE DEFENSE

16   WOULD NEED TO COME FORWARD WITH, WITH NEW INFORMATION TO REOPEN

17   A HEARING.  ONCE A HEARING IS REOPENED, THEN IT'S FULLY

18   REOPENED AND I CAN CONSIDER EVEN FLIGHT RISK AGAIN.

19        THERE'S BEEN NO EVIDENCE PRESENTED.  I -- IF THE HEARING

20   WERE REOPENED, THERE'S A CHANCE THE COURT WOULD INVITE THE

21   PARTIES TO PRESENT EVIDENCE.  THAT'S ALL I CAN TELL YOU RIGHT

22   NOW.

23             MR. HOPKINS:  THANK YOU, YOUR HONOR.

24             THE COURT:  ALL RIGHT.  SO ON A STATUS, MR. COPPOLA,

25   YOUR VIEWS?
```

KIMBERLY BENNETT, OFFICIAL COURT REPORTER, USDC

1          MR. COPPOLA:  YOUR HONOR, I -- COUNSEL AND I HAVE MET

2    AND CONFERRED, AND AT THIS POINT, YOUR HONOR, WHAT WE'RE ASKING

3    IS TO CONTINUE THE STATUS HEARING FOR ABOUT 60 DAYS AT THIS

4    POINT, WITH A T4 EXCLUSION FOR COUNSELS' CONTINUED PREPARATION.

5       I KNOW COUNSEL -- FROM MY DISCUSSIONS WITH COUNSEL THAT

6    THEY ARE -- ARE STILL WORKING THROUGH THE DISCOVERY THAT WE

7    HAVE PROVIDED.  WE'VE RECENTLY PROVIDED SOME ADDITIONAL

8    DISCOVERY, AND THERE IS -- AS I NOTED TO COUNSEL THIS MORNING,

9    WE'LL HAVE SOME ADDITIONAL DISCOVERY TO PROVIDE IN THE COMING

10   WEEKS.

11      SO WITH THAT, YOUR HONOR, IN TAKING A LOOK AT SCHEDULES,

12   LOOKING TOWARDS THE END OF AUGUST, IF THE COURT IS AVAILABLE ON

13   AUGUST 21ST, THAT WOULD -- THAT WOULD WORK FOR THE GOVERNMENT.

14   I DON'T KNOW IF THOSE DATES ARE AVAILABLE -- WOULD WORK.

15          THE COURT:  AUGUST 21ST IS AVAILABLE.

16      THAT WORK FOR YOU, MS. HOPKINS, MS. SINHA?

17          MR. HOPKINS:  YES, YOUR HONOR.

18          THE COURT:  ALL RIGHT.  SO AUGUST 21ST WILL BE A NEXT

19   STATUS.

20      THERE IS A MOTION TO EXCLUDE TIME?

21          MR. COPPOLA:  YES, YOUR HONOR.  UNDER T4 FOR THE

22   REASONS I NOTED.

23          THE COURT:  ALL RIGHT.  DO YOU JOIN IN THAT?

24          MR. HOPKINS:  NO OBJECTION, YOUR HONOR, TO EXCLUSION.

25          THE COURT:  ALL RIGHT.  TIME IS EXCLUDED BASED ON

1    LOCAL CODE T4 AND THE CORRESPONDING FEDERAL STATUTE, GIVEN THE

2    RECORD JUST MADE, TO AUGUST 21ST OF THIS YEAR.

3        I ALSO WANT TO MAKE CLEAR, I DID CHECK WITH THE MARSHAL

4    ABOUT THE MEDICAL ISSUES, AND THE MARSHAL'S POINT OF CONTACT

5    FOR MEDICAL ISSUES WITH SACRAMENTO COUNTY JAIL DID COMMUNICATE

6    WITH THE JAIL.  WITHOUT GOING INTO DETAIL, WHAT THAT PERSON

7    UNDERSTANDS IS THAT MR. KURASHEV IS COMFORTABLE COMMUNICATING

8    WITH MEDICAL STAFF IN ENGLISH.  IF THAT IS NOT THE CASE, THAT

9    NEEDS TO BE CLEARED UP.  AND, MOREOVER, THAT THEY REVIEWED WITH

10   HIM HIS OVERALL MEDICAL STATUS AND HE DID NOT COMMUNICATE ANY

11   DISTRESS.

12       SO IF THERE IS MORE TO -- MORE TO WHAT'S GOING ON THERE,

13   THEN THE DEFENSE COUNSEL CAN FOLLOW UP WITH THE MARSHAL'S

14   CONTACT.

15            MR. HOPKINS:  YES, YOUR HONOR.

16            THE COURT:  ALL RIGHT.  ALL RIGHT.  THANK YOU.  SEE

17   YOU IN AUGUST.

18            MR. COPPOLA:  THANK YOU, YOUR HONOR.

19               (PROCEEDINGS ADJOURNED, 8:44 A.M.)

20                        ---OOO---

21   I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

22   RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

23

24                    /S/ KIMBERLY M. BENNETT
                      KIMBERLY M. BENNETT
25                    CSR NO. 8953, RPR, CRR, RMR